CARBRO CONSTRUCTION COMPANY, PLAINTIFF–RESPON-
DENT, AND UTILITY & TRANSPORTATION CONTRACTORS
ASSOCIATION OF NEW JERSEY, INC., A NOT–FOR–PROFIT
CORPORATION OF THE STATE OF NEW JERSEY, PLAIN-
TIFF–INTERVENOR–RESPONDENT, v. MIDDLESEX COUNTY
UTILITIES AUTHORITY AND LODIGIANI U.S.A., LTD., DE-
FENDANTS–APPELLANTS.

CRIS–TEC ASSOCIATES, INC., ERNEST RENDA CONTRACTING
CO., INC., AND GARY FEATH, INDIVIDUALLY, PLAINTIFFS–
RESPONDENTS, AND UTILITY & TRANSPORTATION CON-
TRACTORS ASSOCIATION OF NEW JERSEY, INC., A NOT–
FOR–PROFIT CORPORATION OF THE STATE OF NEW JER-
SEY, PLAINTIFF–INTERVENOR–RESPONDENT, v. MIDDLE-
SEX COUNTY UTILITIES AUTHORITY AND LODIGIANI
U.S.A., LTD., DEFENDANTS-APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued May 3, 1989—Decided May 12, 1989.

Before Judges GAULKIN, R.S. COHEN and A.M. STEIN.

*Richard R. Bonamo* argued the cause for appellant Middlesex County Utilities Authority (*Wilentz, Goldman & Spitzer*, attorneys).

*Charles Molineaux* argued the cause for appellant Lodigiani U.S.A., Ltd. (*Zorc, Rissetto, Weaver & Rosen* and *Peckar & Abramson*, attorneys, *Charles Molineaux* and *Richard L. Abramson* on the brief).

*Andrew K. Ruotolo, Jr.* argued the cause for respondent Carbro Construction Company (*Weiseman, Mella & Ruotolo*, attorneys).

*Steven E. Brawer* argued the cause for intervenor-respondent Utility & Transportation Contractors Association (*Cole, Geaney, Yamner & Byrne*, attorneys).

*Michael O. Renda* argued the cause for respondent Ernest Renda Contracting Co., Inc., Cris–Tec Associates, Inc. and Gary Feath (*Waldman, Renda & McKinney,* attorneys).

The opinion of the court was delivered by

R.S. COHEN, J.A.D.,

Middlesex County Utilities Authority (MCUA) advertised for bids to build a one-mile outfall line to carry treated effluent from its sewage treatment plant into Raritan Bay. Prospective bidders complained of defects in the contract documents and asked MCUA to correct them or not proceed to receive bids. MCUA went ahead. Plaintiff contractors declined to submit bids. Joined by a taxpayer and a contractors' trade association, they sued MCUA and secured a judgment barring the award of a contract on the thesis that it would contain a fatal statutory violation. We now affirm, but for somewhat different reasons.

Paragraph CA.40 of the contract requires the contractor to guarantee the work and materials for one year after completion. The provision condemned by the Law Division judge is CA.41, which he read to require MCUA to retain 2% from each monthly progress payment to be held for the guarantee period for "repairs, corrections or replacements" which the contractor fails to make. At the end of the year, if the work is in good order, the retainage or so much as remains is paid to the contractor.

Another paragraph, CA.33, retains 2% from each progress payment "as part security for the fulfillment of the Contract." [1] That 2% is paid to the contractor upon final completion, which just precedes the one-year guarantee period.

Retainage was one of the subjects of 1979 amendments to the Local Public Contracts Law, *N.J.S.A.* 40A:11–1 *et seq., L.* 1979, *c.* 464, which governs MCUA's construction contracts. *See*

---

[1] Both completion and repairs are also to be secured by a required performance and maintenance bond.

*N.J.S.A.* 40A:11–2. The amendments require contracts exceeding $100,000 to provide for progress payments at least monthly (*N.J.S.A.* 40A:11–16.2), and, if the contractor agrees to a withholding of a percentage of payments, "2% of the amount due on each partial payment shall be withheld ... pending completion of the contract or agreement." *N.J.S.A.* 40A:11–16.3. Contracts may also provide for monthly payments for materials delivered. *N.J.S.A.* 40A:11–16.4.

The purpose of the amendments, according to the Senate County and Municipal Government Committee was

to ease the cash flow problems experienced by contractors on medium and large scale public construction or maintenance projects.

[T]he provision for 2% withholding on partial payments ... is the provision currently in effect for State contracts.... The purpose of the bill in extending the provision to local units is to standardize this practice among the governmental units of the State.

■ Because the legislative goal of the amendments was to ease contractors' cash flow problems and standardize public contracting practices, the statutory 2% retainage must be treated as a maximum. Retainage may not be held for the guarantee period, tying up contractors' funds for a year beyond "completion of the contract or agreement." *N.J.S.A.* 40A:11–16.3. Completion does not mean the end of all contractor obligations, but is a word of art signifying entitlement to final payment upon acceptance of the work, subject to contractual maintenance or guarantee obligations. *See Graybar Electric Co. v. Manufacturers Casualty Co.,* 21 *N.J.* 517, 524 (1956); 64 *Am.Jur.*2d, *Public Works and Contracts,* § 116 at 979 (1972). *Cf. U.S. F. & G. Co. v. Rome Concrete Pipe Co.,* 256 *Ga.* 661, 353 *S.E.*2d 15 (1987); *American Fire & Cas. Co. v. First Nat. Bank of New York,* 411 *F.*2d 755 (1 Cir.1969), *cert.* den. 396 *U.S.* 1007, 90 *S.Ct.* 563, 24 *L.Ed.*2d 499 (1970).

The meaning of CA.41 is something of a mystery. In a pre-bid inquiry to MCUA, prospective bidders complained that CA.41 unlawfully required 2% to be retained for repairs from monthly progress payments in addition to the 2% retainage for

completion required by CA.33. MCUA's written response, which became a part of the contract documents, was "Only 2% represents true retainage." MCUA did not deny the premise of the inquiry that a second 2% would be deducted from progress payments for repairs.

In the Law Division, the successful low bidder and MCUA said that CA.41 permits the owner's engineer to retain money only for known defects, that is, "if he observes that repair work is actually required." It is not clear why such an observation should have to be made before completion or how the engineer could find a defect and yet say the work was completed for the purpose of final payment under CA.34.[2] Before us, the successful bidder suggests that the optional repair deduction is to be made only out of the final completion payment. It points out that the repair retainage is not required by the contract to be deducted from monthly payments, but only "may" be deducted "out of the moneys otherwise payable to the Contractor hereunder." If, however, the repair retainage is intended as security against defects, it makes no sense to secure the repair of known defects but not repair of unknown defects the possibility of which gave rise to the one-year guarantee.

There is another problem. If repair retainage is not deducted from monthly payments, it must come out of the final completion payment. If MCUA "may" retain money for unknown future repairs, on what basis does it decide if it should do so if it cannot tell in advance whether repairs will be necessary?

Three readings of CA.41 are possible. The first is that CA.41 deducts 2% from each monthly payment, in addition to CA.33's 2% for completion, to secure the contractor's one-year

---

[2] The contractors' association expressed similar puzzlement in a pre-bid letter to MCUA's consulting engineer. It said, "Also, we don't understand what the 2 percent for repair represents. If an area of work needs to be repaired, the work would not be paid for in the monthly progress payment." There was no response.

repair obligation. This is a reasonable but not necessary reading, which was encouraged by MCUA's pre-bid failure to deny it. If it is a correct reading, it creates a violation of *N.J.S.A.* 40A:11–16.3.

The second reading is that CA.41 permits but does not require MCUA to deduct from any contract payment up to 2% to secure repair of a known defect. If this is what MCUA meant, it adopted unusually inappropriate language to express it. In addition, it ignores the prospect of defects appearing during the guarantee period. It is not a reasonable reading.

The third reading is that CA.41 permits but does not require MCUA to withhold final payment funds up to 2% to secure repair of unknown defects. This reading, which was suggested only on appeal, is less offensive to *N.J.S.A.* 40A:11–16.3 but gives MCUA an option, with no guidance for its exercise, to hold back $477,500 for a year.

Responsible parties represented by competent counsel make respectable arguments for each reading. The contractual language is imprecise. MCUA's consulting engineer refused pre-bid pleas for clarification. Some plaintiffs say they declined to spend time and money to prepare bids for a contract destined for invalidation. Conforming bids ranged from $23.875 million to over $33 million. The low bid was low by $3.669 million. It is inconceivable that differing readings of CA.41 substantially affected the bids that were received. We do not know if other contractors were put off by legal doubts or the spectre of excessive cash retainage. We have no reservations about the good faith of MCUA. We must nevertheless affirm the injunction barring execution of the contract.

If CA.41 permits deduction of 4% of progress payments, it offends the 2% limit of *N.J.S.A.* 40A:11–16.3, which bars retainage of more than 2%, whether for completion or post-completion

repairs. It was intended to prevent excessive restriction of cash flow to contractors for fear of discouraging bidding by qualified but not-cash-rich contractors. A violation of the 2% limit necessarily has the capacity to create the situation that the Legislature sought to prevent, and must be invalidated even without proof of such an effect. *Cf. Terminal Const. Co. v. Atlantic Cty. Sewerage Auth.,* 67 *N.J.* 403, 410 (1975).

 If CA.41 gives MCUA an option to retain funds from final completion payment for unknown future repairs, it is invalid because it gives MCUA an option with no standards for guidance. The decision to withhold 2% of final payment to guarantee repairs can fairly be made only before bids are submitted. Leaving the decision open until the end of the job creates the opportunity for favoritism which can be differentially reflected in the bids of friends and strangers to the contracting agency. A public contract provision, however well intended, is invalid if it can become a vehicle for corruption or favoritism, or improperly affect the amount of various bids or discourage bidding. *See Pucillo v. Mayor & Council of Borough of New Milford,* 73 *N.J.* 349, 356 (1977).

 The benefits of the broadest competition for public contracts are apparent. The keystone of competitive bidding is perfect equality putting all bidders, actual or potential, on the same footing. *Skakel v. North Bergen,* 37 *N.J.* 369, 378 (1962). Required for the purpose are bid specifications that provide full disclosure and prescribe a common standard on all material matters. Only curtailing local discretion and requiring strict compliance with bidding guidelines will protect the public against favoritism, improvidence, extravagance and corruption. *Pucillo v. Mayor and Council of Borough of New Milford,* 73 *N.J.* 349, 356 (1977); *Terminal Const. Corp. v. Atlantic Cty. Sewerage Auth.,* 67 *N.J.* 403, 410 (1975); *Waszen v. City of Atlantic City,* 1 *N.J.* 272, 283 (1949).

■ Here, it is impossible to say with any assurance how potential bidders read the retainage provisions. If this were a private contract, we would find a sensible meaning in order to resolve a dispute. If it were a statute, we would search for a validating construction.[3] A bid proposal which is vague, conflicting and possibly illegal, however, must be treated differently. If the defects could have affected the bidding process, they bar a contract based on them. *Waste Disp., Inc. v. Mayor & Coun. of Roselle Pk.*, 145 *N.J.Super.* 217 (App.Div.1976).

■ In summary, we hold that: (1) provision for retainage, whether for completion or post-completion repairs, under which the owner withholds more than 2% of the contract price, violates *N.J.S.A.* 40A:11–16.3; (2) retainage held past final completion, even for post-completion repairs, violates *N.J.S.A.* 40A:11–16.3; (3) a contract provision is invalid which gives the owner or its engineer or architect discretionary authority at the beginning of the guarantee period to decide whether to require security for the guarantee and in what amount; (4) we do not outlaw the concept of a cash deposit from the contractor to guarantee repairs or maintenance. We do not have before us, however, the questions (a) whether such a requirement would be subject to the alternative deposit provisions of *N.J.S.A.* 40A:11–16.1, or (b) whether 2% of the contract is an excessive cash deposit requirement, alone or in conjunction with a guarantee bond required pursuant to *N.J.S.A.* 40A:11–22(2).

Affirmed.

---

[3] *See Princeton Cablevision, Inc. v. Union Valley Corp.*, 195 *N.J.Super.* 257, 270 (Ch.Div.1983). As to the chameleon word "may" *see Harvey v. Essex County Board of Freeholders*, 30 *N.J.* 381, 391–392 (1959).