W.V. PANGBORNE & CO., INC., PLAINTIFF-APPELLANT, v. NEW JERSEY DEPARTMENT OF TRANSPORTATION, DEFENDANT-RESPONDENT.

Argued May 9, 1989—Decided August 14, 1989.

544

*Edward M. Callahan, Jr.,* argued the cause for appellant (*Clancy, Callahan & Smith,* attorneys; *Edward M. Callahan* and *James J. Cronin,* on the briefs).

*Nickolas F. Monteforte,* Deputy Attorney General, argued the cause for respondent (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney; *James J. Ciancia,* former Assistant Attorney General, of counsel; *Nickolas F. Monteforte* and *Anne Marie Kelly,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

HANDLER, J.

The question in this case is whether the statute of limitations under the Contractual Liability Act can be invoked to bar an action against the State Department of Transportation by a contractor that, at the invitation of the State, had pursued an administrative disposition of its claim. The trial court ruled that the State should be equitably estopped from asserting its statutory-limitations defense because it participated in the attempted administrative disposition of the contractor's claim. On appeal, the Appellate Division reversed. It rejected the theory of equitable estoppel as well as the argument that the statute of limitations was tolled because the contract was not "complete" until the administrative review of the claim had been concluded.

We thus consider on this appeal whether a public contract remains uncompleted during the pendency of administrative proceedings to determine disputed claims for purposes of the limitations defense under the Contractual Liability Act. We consider also whether the initiation and participation by the State in such administrative proceedings can give rise to an equitable estoppel that bars assertion of the limitations defense. The circumstances of this case, further, implicate the issue of whether principles of contract fairness prevent the State from asserting the limitations defense because the State was impliedly obligated to deal expressly with the effect, if any, of administrative-review proceedings on the availability of the statute of limitations defense in a judicial action.

I.

The plaintiff, W.V. Pangborne & Co. (Pangborne), is a licensed electrical contractor that was awarded a contract on October 6, 1980, by the State Department of Transportation (DOT) for the rehabilitation and re-electrification of the Gladstone Branch of the Erie Lackawanna Line. The parties entered into the contract on November 19, 1980, and Pangborne

began work on February 18, 1981. In the course of this project, in September 1983, Pangborne submitted a request to enlarge its fees to recover the cost of rock excavation, which it claimed was not contemplated in the plans and specifications on which Pangborne's original bid submission was based. Two months later, in November 1983, DOT notified Pangborne by letter that it was rejecting Pangborne's request. However, in that letter, DOT invited Pangborne to submit its claim to the Claims Committee:

> I must reaffirm the prior rejection of any consideration for costs for subsurface rock excavation....
>
>     *      *      *      *      *      *      *      *
>
> If W.V. Pangborne & Co., Inc. wishes to pursue this claim further, they may do so by submitting the claim in accordance with *N.J.A.C.* 16:33–2–1 through 2–8 (copy attached).
>
> [Letter from Martin Van Riper, Superviser Construction Engineer, DOT, to James Haugh, Project Manager, Pangborne, dated November 17, 1983.]

According to the record, Pangborne's work under the contract was substantially completed by June 1983. After Pangborne completed connective and clean-up work, it left the project site in March 1984. On July 3, 1985, Pangborne filed its claim with DOT's Claims Committee. On July 22, 1985, while the matter was before the Claims Committee, DOT sent Pangborne documentation for final payment. On December 29, 1985, while the claim was still pending before the Claims Committee, DOT accepted Pangborne's qualified release and notified Pangborne that it was making final payment. DOT then informed Pangborne that it was not waiving any rights or defenses to which it was entitled under the relevant statutes:

> Since your company has qualified the Standard Release, this office has processed your qualified release for a possible waiver of the Department's right to insist upon an absolute and unconditional release prior to making final payment.... By acceptance of this conditional release, the State does not acknowledge the validity of the claims asserted by your company, nor does it waive any requirements or limitations as imposed or the defenses it may have all by virtue of the provisions of *N.J.S.A.* 59:1–1 *et seq.* or *N.J.S.A.* 59:13–1 *et seq.*
>
> [Letter from Gene Helsel, Dep't of Transp. to R.T. Conley, Sr., President, Pangborne, dated December 20, 1985.]

On January 13, 1986, DOT issued a check pursuant to Pangborne's qualified release, and by January 22, 1986, Pangborne had cashed the check. DOT argues that Pangborne's acceptance of payment at this time started the running of the statute of limitations.

The administrative claims process took about fifteen months. As stated earlier, Pangborne filed its claim in July 1985. The hearing was postponed due to the Claims Committee's revised procedures, relating principally to pagination and copy requirements. The first hearing was finally scheduled for August 20, 1986 (more than one year after the claim was filed). The Committee issued its decision to reject the claim on October 22, 1986, with no reason stated. Pangborne argues the statute of limitations should have begun to run at that time.

Pangborne filed its lawsuit on April 8, 1987. If the one-year statute of limitations had begun to run when Pangborne accepted the State's final payment on January 22, 1986, Pangborne would have been two and one-half months too late. The State's motion for summary judgment was denied by the trial court, which found that circumstances called for equitable estoppel to prevent the State from asserting that the statute of limitations was not tolled until the Claims Review was completed. The Appellate Division in a reported decision, *W. V. Pangborne & Co. v. New Jersey Dep't of Transp.*, 226 *N.J.Super.* 367 (1988), rejected this argument, as well as the argument that the contract is not "complete" until the Claims Review is concluded. This Court granted the plaintiff's petition for certification. 114 *N.J.* 301 (1988).

## II.

Pangborne asks this Court to interpret the statutory language regarding the "completion of the contract" to imply a requirement that administrative review of pending disputed claims must be determined and completed before the statute of limitations begins to run. The statute reads:

> In all contract claims against the State, the claimant shall be forever barred from recovering against the State if:
>
> a. he fails to notify the appropriate contracting agency within 90 days of accrual of his claim except as otherwise provided in section 6 hereof; or
>
> b. he fails to file suit within 2 years of accrual of his claims or *within 1 year after completion of the contract* giving rise *to paid claim,* whichever may be later; or
>
> c. the claimant accepts personally or through his agent or legal representative any award, compromise or settlement made by the State of New Jersey. [*N.J.S.A.* 59:13–5 (emphasis added).]

DOT's contract with Pangborne incorporates the State's Standard Specifications, which by its own terms provide that the "project" covered by the contract is "complete" when the contractor's work has been "accepted" and final or qualified final payment is made. Article 1.8.6 of the Specifications states:

> When all the work included in this Contract has been accepted by the Commissioner and the *final* or a *conditional final certificate has been paid,* the Project shall be considered as completed, and the Contractor shall be released from all further obligations and requirements, except as set forth and provided in Art. 1.5.8 and 1.8.7 and as provided in Art. 1.8.5 regarding reimbursement to the State of any overpayment to the Contractor on a conditional final certificate. (Emphasis added.)

According to DOT, the contract's own terms are quite explicit and clear: the contract was "complete" when DOT accepted the work performed by the contractor and final or conditional final payment was made.

There is general support for the understanding that the term "completion" of a public-construction contract refers to the acceptance of the work by the party for whom it is being done. 64 *Am.Jur.*2d *Public Works and Contracts* § 116 (1972). The phrase "completion of the contract" for a public contract was considered in *Carbro Construction Co. v. Middlesex County Utilities Authority,* 233 *N.J.Super.* 116 (App.Div.1989). The court considered that phrase in the context of the State's statutory right to hold a retainage fee, pending the "completion" of the contract. *N.J.S.A.* 40A:11–16.3. The court found that "completion" meant *acceptance* because this is the act on

the occurrence of which the contractor is first entitled to payment:

> [Completion] is a word of art signifying entitlement to final payment upon acceptance of the work, subject to contractual maintenance or guarantee obligations. [233 *N.J.Super.* at 120.]

The court relied on *Graybar Electric Co. v. Manufacturers Casualty Co.*, 21 *N.J.* 517 (1956). There, the Court interpreted a contractual provision between the State and a contractor under which the State had the right to retainage for sixty days after "acceptance" of the contract. While this contract governing the same statutory right to retainage interpreted above used "acceptance" rather than "completion" as the operative term, the Court distinguished physical completion from *completion and acceptance* of the contract, ruling that there must be "unconditional and complete acceptance of the contractor's work" in order for there to be entitlement to payment. *Id.* at 524.

Other decisions generally reflect this understanding. In *Maurice E. Keating, Inc. v. Township of Southampton*, 149 *N.J.Super.* 118 (1977), the Appellate Division interpreted "acceptance of the project" for determining the time at which a subcontractor had a statutory right to bring its claim against a surety on a public-works project; it ruled that this right accrued when the whole project had been *accepted* as well as physically completed. *See also Hartford Fire Ins. Co. v. Riefolo Constr. Co.*, 81 *N.J.* 514, 524 (1980) (under clear language of contractor's insurance contract, as well as under general common law, contractor was liable for any risk of loss until *acceptance* of project, and not just physical completion); *Mahony–Troast Constr. Co. v. Supermarkets Gen. Corp.*, 189 *N.J.Super.* 325 (App.Div.1983) (acceptance of the whole project treated as synonymous with "completion" of the project; therefore, owner's right to sue for design defects did not begin to run until certificates of occupancy had been issued).

The Appellate Division decision in this case is in accord with this understanding. The court ruled that the contract was

completed when the criteria for completion of the project, as expressed in Article 1.1.3 of the State's Standard Specifications, were met. This included "acceptance" of the work by DOT. 226 *N.J.Super.* at 376. Pangborne contends, however, that this determination misreads the terms of the contract. It points out that there are separate definitions in DOT's standard contract for the terms "contract" and "project," and that those terms, therefore, cannot be used interchangeably. The term "contract" is defined as "the agreement covering the performance of the [p]roject and payments therefor"; "project" is defined as "the entire work to be performed under the contract." Article 1.1.3. According to Pangborne, because the "contract" is defined as an agreement covering payments as well as performance, the "contract" is not completed until the payments are made.

Pangborne buttresses its argument by stressing that the term "payments" under the Specifications refers to payments involving "supplementary specifications," "plans," and "change orders."[1] It also refers to Article 1.5.7 calling for notification to DOT before extra work can be undertaken. It thus argues that "payments" include payments that are subject to administrative review. Hence, such payments are not completed until DOT's claims-review process is completed, and therefore the

---

[1] As noted, Article 1.1.3 of the General Specifications provides that the contract consists of "the agreement covering the performance of the project and payments therefor." The definition continues as follows:

including Advertisement for Proposal, Proposal, Certification as to Publication and Notice of Advertisement for Proposal, Appointment of Agent by Nonresident Contractors, Noncollusion Affidavit, Warranty Concerning *Solicitation of the Contract by Others, Progress Schedule, Resolution of* Award of Contract, Executed Form of Contract, Contract Bond, Standard Specifications, *Supplementary Specifications, Plans, Change Orders,* Supplementary Agreements, and letters or other information giving interpretations or revisions of any of the foregoing documents which are mailed to prospective bidders not less than 3 days prior to the date scheduled for the receipt of bids, all of which are to be treated as one instrument whether or not set forth at length in the form of Contract. (Emphasis added.)

contract cannot be completed for purposes of the Contractual Liability Act until the administrative review is concluded.

This argument overstates the importance of the Specifications' definition of "contract" to the resolution of the statutory meaning of the phrase "completion of the contract." *N.J.S.A.* 59:13–5b. While the definition of "contract" under the Specifications refers to "payments therefor," which clearly means payments for the performance of the work, these are intended to include payments made on final certification and not to later payments involving disputed claims the resolution of which are the subject of administrative proceedings.

However, the interchangeable use of the terms "contract" and "project" by the Appellate Division is potentially confusing in light of the separate definitions of these terms in Article 1.1.3. As noted, "contract" is defined in terms of the respective obligations of each party to the contract, namely, performance and payment. On the other hand, "project" is defined only in terms of the obligation of the contractor, *i.e.*, performance of the work. Nonetheless, Article 1.8.6 defines completion of the project by referring to the obligations of both DOT and the contractor. Article 1.8.6 states that the "project" shall be considered completed only after DOT accepts the work, that is, the work performed by the contractor and, further, pays the contractor the "final or a conditional final certificate." Article 1.8.6, in effect, reconciles the meaning of "project" with that of "contract" as defined in Article 1.1.3.

We are thus satisfied that the express terms of the contract and its implementing specifications do not support Pangborne's contention that the contract was not "complete" within the meaning of *N.J.S.A.* 59:13–5b until its disputed claim was determined at the conclusion of the administrative review process. The "completion" of the contract occurred when the contractor's work had been accepted and final conditional payment was authorized by the State. This meaning is reasonably clear, especially in light of the contractual definition of its own

terms. Further, this definition comports generally with decisional law, which suggests that the ordinary interpretation of "completion" in public works contracts is the acceptance of the project, usually accompanied by approval of final payment. There is no reason to assume that the Legislature entertained a different understanding of the term "completion" when it provided for a limitations defense to judicial actions taken against the State under the Contractual Liability Act.

In this case, the contract was completed when DOT accepted Pangborne's work and approved final conditional payment. That occurred in January 1986 when DOT issued its acceptance and sent the check for final payment. Pangborne had one year from that time to file its claim to comply with the one-year statute of limitations of *N.J.S.A.* 59:13–5b.

### III.

Pangborne also argues that equitable considerations should bar the imposition of the statutory-limitations defense. It urges principally that under the circumstances arising out of the claims-review process, the doctrine of equitable estoppel should apply to bar the assertion of the statute of limitations defense.

The requirements of equitable estoppel are quite exacting. We have defined equitable estoppel as

> the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed ... as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse....
>
> [*Carlsen v. Masters, Mates & Pilots Pension Plan Trust*, 80 *N.J.* 334, 339 (1979) (citations omitted).]

In contract actions, equitable estoppel has been used to prevent a defendant from asserting the statute of limitations when the defendant engages in conduct that is calculated to mislead the plaintiff into believing that it is unnecessary to seek civil redress. Thus, we have recognized that equitable estoppel

may be appropriate where "a defendant has lulled a plaintiff into a false sense of security by representing that a claim will be amicably settled without the necessity for litigation." *Lawrence v. Bauer Publishing & Printing, Ltd.*, 78 *N.J.* 371, 376 (1976). Nevertheless, equitable estoppel is rarely invoked against public entities, *O'Malley v. Department of Energy*, 109 *N.J.* 309, 316 (1987), although it may be invoked to prevent manifest injustice. *Anske v. Borough of Palisades Park*, 139 *N.J.Super.* 342, 348 (App.Div.1976).

In this case, the Law Division found that DOT was estopped from asserting the statute of limitations because of its conduct that led Pangborne reasonably to believe that litigation was not necessary until a final agency decision had been made. The court relied on several factors: (1) the claim had been monitored and verified early in the project by DOT's own representatives; (2) Pangborne had made it clear to DOT that it was not abandoning its claim when it signed a qualified release; (3) the Claims Committee continued to request documents after the release was signed, thus reinforcing Pangborne's impression that the Committee was undertaking a full and comprehensive review; and (4) the Claims Committee took fifteen months to process the claim. The Appellate Division, however, was not convinced that those factors justify the imposition of equitable estoppel. We concur in its assessment. We find that under those circumstances, it does not appear that DOT made any representation or engaged in conduct that was calculated to mislead Pangborne into a misperception concerning the eventual need to resort to litigation or to lull it into a false sense of security with respect to its right to take judicial action.

In November 1983, when DOT initially invited Pangborne to seek an administrative disposition of its claim for extra rock excavation, the project was not then completed; DOT had not yet accepted Pangborne's work or authorized final payment. Thus, long before Pangborne had any legal entitlement to payments under the contract, it was aware that it was confront-

ed with a potential future controversy over the matter with DOT. Moreover, when DOT suggested the availability of administrative review, it did not waive any defenses that it had. Further, after Pangborne had submitted its claim for administrative review, DOT, in accepting Pangborne's conditional release, renewed its rejection of Pangborne's claim and expressly reserved its right to assert all defenses to the claim. *Supra* at 547. There was nothing to suggest that in addition to any meritorious defenses to the claim, a defense based on the statute of limitations defense under *N.J.S.A.* 59:13–5b would not be asserted.

Further, it does not appear that DOT's monitoring and verifying of the excavation work under the contract, a factor enumerated by the trial court, indicated that DOT was intentionally misleading Pangborne into believing that civil redress would not be necessary. Pangborne submitted its claim for administrative review, in the summer of 1985, long after it had done the extra excavation work in the fall of 1983 and left the site in the spring of 1984. Pangborne signed only a qualified release, indicating its insistence on full payment of the disputed claim; DOT, however, refused payment of this claim. Thus, both parties remained in an adversarial posture, presumably remaining free to assert all claims and defenses. The fact that the Claims Committee thereafter requested additional documentation to decide the matter, another factor stressed by the trial court as indicating a full and comprehensive review by DOT's Claims Committee, also does not show that DOT changed its prior position in any way or intended to mislead Pangborne into believing litigation would be unnecessary.

In sum, it does not appear that in the course of the administrative review process DOT made express representations or engaged in any overt conduct calculated to generate the expectation or belief on the part of Pangborne that DOT would forego or waive its defenses on the claim, including the statute of limitations.

The trial court, as noted, gave weight to the duration and apparent thoroughness of the administrative review in concluding that equitable estoppel applied. Equitable estoppel has been invoked to prevent a defendant from asserting the statute of limitations in contract actions that have entailed extensive settlement negotiations. *See, e.g., Lawrence v. Bauer Publishing & Printing, Ltd., supra,* 78 *N.J.* 371. Courts have determined that through the process of negotiating, a defendant can intentionally lull a plaintiff into believing litigation is not necessary; a defendant in those circumstances may not take advantage of the protracted negotiations to have the statute of limitations run against the plaintiff's claim. *See Friedman v. Friendly Ice Cream,* 133 *N.J.Super.* 333, 337 (App.Div.1975); *see also Griggs v. Bertram,* 88 *N.J.* 347 (1982) (where insurer failed for unreasonable time to inform plaintiff of potential disclaimer, and its conduct thereby had foreclosed independent or parallel action by the insured to defend himself, insurer was equitably estopped from asserting the disclaimer altogether); *Harr v. Allstate Ins. Co.,* 54 *N.J.* 287 (1969) (where insurer had concealed from plaintiffs for over two years that plaintiffs were suing under the wrong policy, insurer was estopped from asserting the statute of limitations as a defense). In this case, the facts suggest only that the administrative review was continuous and comprehensive. The proceedings were not tantamount to an arbitration or settlement process by which DOT, through its conduct, might have inadvertently created the impression that there would be an amicable resolution of differences or a result acceptable to the contractor so that further litigation would not be necessary.

The trial court also mentioned the period of time, fifteen months, for the administrative proceeding to be concluded. As a general rule, a statute of limitations governing the timeliness of an action will not be tolled for a pending determination in another tribunal unless there is an exhaustion requirement. "The general rule is that in order that the pendency of other proceedings shall have the effect of tolling the statute of

limitations on a cause of action, the proceedings must be such as to prevent enforcement of the remedy by action." *Nix v. Spector Freight Sys., Inc.,* 62 *N.J.Super.* 213, 223 (App.Div. 1960).

■ In this case, there is no express statutory or contractual exhaustion requirement referable to the pursuit of an administrative remedy. In *Frapaul Construction Co., Inc. v. State of New Jersey Department of Transportation,* 175 *N.J.Super.* 84, 92 (App.Div.1980), the court concluded that there was no requirement that administrative review before the Claims Committee be exhausted before there could be resort to a judicial action. It noted that such proceedings benefit DOT by providing it with a forum to analyze claims in order to determine their merits for the possibility of settlement and to begin investigation for the purpose of preparing for trial. Such proceedings do not constitute a precondition to a judicial action. Moreover, the legislative history demonstrates that the Legislature rejected sole reliance on administrative tribunals on the basis of its study of the California system, which requires administrative exhaustion. "New Jersey Attorney General's Task Force on Sovereign Immunity Report" 14–16 (1972) (hereinafter "Atty. Gen. Report"). It found that in California, use of the administrative board acted often as a "rubber stamp" for the agency, did not alleviate the problems of judicial calendar control and congestion, did not call for any special expertise otherwise unavailable to the court system, and in fact created its own bureaucracy of questionable value. *Ibid.* We are thus satisfied that the Legislature did not intend the Contractual Liability Act to require the exhaustion of administrative relief as a precondition to the initiation of a legal action.

We concur with the Appellate Division that plaintiff has not on this record established a factual basis for invoking the doctrine of equitable estoppel arising out of any representations or conduct by DOT under the contract. That conclusion, however, does not relieve the State in these circumstances of the obligation to deal forthrightly and fairly with its contractor.

The contract itself does not explicitly address the claims-review process, nor how that process relates, if at all, to the completion of the contract and the accrual of a right of judicial redress. While those omissions do not derogate literally from the meaning of "completion," see discussion *supra* at 552–553, they do create under these circumstances the potential for confusion and unfairness with respect to the legal effect of administrative proceedings on a later judicial action. Although the statute requires that the claimant shall be barred from bringing civil suit if it fails to notify the appropriate agency within ninety days of accrual of its claim, *N.J.S.A.* 59:13–5a, there is no reference to any claims-review process itself or whether such a process could have an effect on the timeliness of judicial relief. Further, the administrative regulations granting the right to administrative review omit any reference to whether the process relates in any way to alternative judicial relief or could bear on the question of when the contract is "complete" for the purpose of determining the period for bringing a civil suit. In fact, the Administrative Code does not even set strict time limits governing the filing of administrative claims. *N.J.A.C.* 16:33–2.3, which requires claimants to file notice before bringing the claim, does not place a time limit on when the notice must be brought:

> If the contractor intends to present a claim to the Department he shall arrange for a meeting with the Regional Supervising Construction Engineer or the District Construction Engineer and the Resident Engineer in charge of the project.

However, the Administrative Code sets very strict time limits following this initial notice. The Code requires that within forty-five days of the above-specified meeting, DOT's Engineer shall inform the contractor of its right to file a claim, and the contractor must then file its claim within this period. *N.J.A.C.* 16:33–2.4(a). The Department must consider all claims presented within the year of the date proposed by the Department for final payment. *N.J.A.C.* 46:33–2.4(a)(4). Further, the Administrative Code requires the Claims Committee to process the claim by holding a final hearing within forty-five days of receipt

of the claim; the Claims Committee then has another forty-five days to make its decision, and the claimant must be informed of its decision within five days thereafter. *N.J.A.C.* 16:33–2.6.

It is important to note that in this case, the review took substantially longer than any of the periods specified by the regulations. As stated earlier, that review process was substantially prolonged due principally to DOT's revisions of procedural requirements wholly unrelated to the underlying claim or to any conduct by Pangborne. However, the effect of delay beyond that anticipated or implied by the regulations in terms of continuing administrative relief or alternative judicial action is not addressed in the regulations, the contract, or the Specifications.

In *Peloso v. Hartford Fire Insurance Co.*, 56 *N.J.* 514 (1970), this Court barred a statute of limitations defense and instead imposed an affirmative obligation on the part of the defendant to dispel the plaintiff's reasonable assumptions based on the defendant's conduct, even if the defendant had not "intentionally lulled" the plaintiff into forestalling civil redress. The Court found that where the defendant-insurer invited the plaintiff to submit its claim for an internal review, used the claim process to investigate the claim in preparation for either settlement or litigation, and plaintiff cooperated in good faith with the insurer's review process, the statute of limitations would not commence until the insurer issued a formal denial. The Court stated that the insured should not be "penalized for the time consumed by the company while it pursues its contractual and statutory rights to have a proof of loss, call the insured in for examination, and consider what amount to pay . . ." *Id.* at 521.

In some ways, DOT's administrative review process is similar to the insurer's internal review examined in *Peloso*. It may be that DOT did not have a contractual or statutory right to insist on an administrative submission or disposition of the claim. Nevertheless, it invited Pangborne to submit its claim for agency review, elicited additional documentation, extended its own preparation, placed itself in a more advantageous position

in anticipation of either litigation or settlement, controlled the pace, extent, and duration of the agency review, and, moreover, expected and received good faith cooperation from Pangborne.

In *Peloso*, the Court read into such circumstances an implied agreement that the insured could wait to litigate his claim until the insurer makes a formal denial. *See also Bowler v. Fidelity & Casualty Co. of N.Y.*, 53 *N.J.* 313, 328 (1969) (fact that insurer reasonably could foresee insured's reliance on insurer to take action triggered a duty by insurer to reject affirmatively claim before insurer could claim statute of limitations defense; insurer had failed to exercise good faith by its silence and inaction on claim). We may consider whether DOT in this case should be required to be held to a similar level of contractual rectitude.

The question is whether DOT should have provided and clearly delineated in its contract, which incorporated the Standard Specifications, the options available to a contractor with respect to disputed claims left unresolved after the completion of the contract. In the circumstances of this case, the question specifically is whether the obligation can be implied in the contractual relationship between the parties that DOT would withhold a statute of limitations defense while its contractor cooperated in submitting a disputed claim to administrative review that DOT itself encouraged and subsequently controlled.

We do not think obligations or entitlements under public contracts should become the matter of either cunning or guesswork. In *P, T & L Constr. Co. v. Commissioner, Dep't of Transp.*, 55 *N.J.* 341, 346 (1970), this Court abolished sovereign immunity, holding that "there should be an established forum in which all such claims may be presented as of right and upon known principles." We have recognized that "[i]n every contract, there is an implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing.'" *Palisades Property,*

*Inc. v. Bruneti,* 44 *N.J.* 117, 130 (1965) (quoting 5 *Williston on Contracts* § 670, pp. 159–60 (3d ed. 1961)). An affirmative obligation to prevent parties from taking advantage of asymmetrical relationships in breach of an implied covenant of good faith and fair dealing has been found in a variety of contexts. *See, e.g., Onderdonk v. Presbyterian Homes of N.J.,* 85 *N.J.* 171 (1981) (where a retirement community has monopoly on information necessary to ensure that money paid for "life-care" contracts was properly spent, owners had implied duty to make available meaningful access to that information); *Fireman's Fund Ins. Co. v. Security Ins. Co. of Hartford,* 72 *N.J.* 63, 72–73 (1976) (insurer had implied covenant to make good-faith effort to settle for amounts in excess of its policy limits); *Rova Farms Resort v. Investors Ins. Co.,* 65 *N.J.* 474 (1974) (insurer had implied covenant to make good-faith evaluation of whether to settle); *see also Kaczmarek v. New Jersey Turnpike Auth.,* 77 *N.J.* 329 (1978) (statute of limitations would not apply where plaintiff was misinformed by agency that it had no jurisdiction, and court should have transferred case back to agency in timely fashion once it ascertained that agency actually did have sole jurisdiction); *cf. Axelrod v. CBS Publications,* 185 *N.J.Super.* 359, 369 (App.Div.1982) (continuing royalty payments did not toll statute of limitations where author previously had managed publishing company, had signed numerous royalty contracts, had believed for more than two years previous to commencement of suit that he was not being given fair count, and had sufficient knowledge to discover evidence of fraud within period of limitations).

■ Moreover, we have insisted that in the exercise of statutory responsibilities, government must "turn square corners" rather than exploit litigational or bargaining advantages that might otherwise be available to private citizens. *F.M.C. Stores Co. v. Borough of Morris Plains,* 100 *N.J.* 418, 426 (1985). "[The government's] primary obligation is to comport itself with compunction and integrity, and in doing so government may have to forego the freedom of action that private citizens

may employ in dealing with one another." *Id.* at 427. We have similarly insisted that government adhere to strict standards in its contractual dealings. *P.T. & L. Constr. Co. v. Department of Transp.*, 108 *N.J.* 539 (1987); *Keyes Martin & Co. v. Director, Div. of Purchase*, 99 *N.J.* 244 (1985); *Pucillo v. Mayor and Council of New Milford*, 73 *N.J.* 349 (1977). Therefore, DOT's failure to act with greater clarity regarding the statute of limitations, its successful encouragement of an administrative proceeding that redounded to its advantage in terms of added investigation, complete discovery, fuller preparation in defense of the contractor's claim, as well as delay in payment, and its subsequent attempt to seek a litigational advantage based on Pangborne's inadvertence or false impression constituted conduct that seems inconsistent with the notion that government must act fairly and "with compunction and integrity." *F.M.C. Stores, supra,* 100 *N.J.* at 427.

We conclude that the effect, if any, of administrative review of a disputed claim on the statute of limitations as a bar to a judicial action is a material matter or condition of a public contract. The failure to deal expressly with this subject can create confusion, disagreement, and the disappointment of reasonable expectations that smacks of unfairness. Therefore, DOT's failure in its promulgation of rules and regulations under the Contractual Liability Act, in the express provisions of its agreement, and in its implementing Standard Specifications, to deal expressly and clearly with this material term constitutes a breach of an implied duty of good faith and fair dealing and the supervening obligation of government to deal scrupulously with the public.

Consequently, DOT may not now insist on the limitations defense of the Contractual Liability Act. In the context of this case, the preclusion of this defense would not be inconsistent with the legislative history behind *N.J.S.A.* 59:13–5 as well as public policy considerations. The comment accompanying the Act permitting claims to be brought against public entities states that the notice and filing requirements "provide a suffi-

cient period of time within which the appropriate State agency and the Attorney General may take administrative action to adjust the dispute." "Atty. Gen. Report," *supra* at 245. The Legislature obviously contemplated that there would be sufficient time to bring both claims if the claimant chose to do so. Further, as *Frapaul* held, the claimants are clearly entitled to both proceedings, and claimants are not required to choose between them. 175 *N.J.Super.* at 89–90.

This result, moreover, will not offend the policies that are served by the statute of limitations. The primary purpose of the statute of limitations is to provide defendants a fair opportunity to defend and to prevent plaintiffs from litigating stale claims. *Ochs v. Federal Ins. Co.*, 90 *N.J.* 108, 112 (1982); *O'Keeffe v. Snyder*, 83 *N.J.* 478, 490–91 (1980). However, where defendants are on notice of the claims, and no significant prejudice results, the policy reasons for upholding a strict statute of limitations recede. *See Galligan v. Westfield Centre Serv., Inc.*, 82 *N.J.* 188, 194 (1980).

Finally, the result will not unduly fetter or interfere with the authority and discretion of DOT. This decision in no way serves to dictate the content of DOT's contract provisions. *See P.T. & L. Constr. Co. v. Department of Transp., supra*, 108 *N.J.* at 561. It will require at most that the State make express provisions in its regulations, contracts or implementing specifications regarding the intended consequences of a particular contractual course of action.

## IV.

Accordingly, the judgment below is reversed.

*For reversal*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For affirmance*—None.