790 A.2d 218

NATIONAL TRANSFER, INC., PLAINTIFF–APPELLANT, v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, DEFENDANT–RESPONDENT.

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, PETITIONER–RESPONDENT, v. NATIONAL TRANSFER, INC., RESPONDENT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted and Argued December 4, 2001—Decided February 6, 2002.

Before Judges PRESSLER, WEFING and LESEMANN.

*Rich & Friedman*, attorneys; (*Marc J. Friedman*, of counsel and on the brief).

*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney for respondent New Jersey Department of Environmental Protection (*Andrea M. Silkowitz*, Assistant Attorney General, of counsel; *Regina H. Nugent*, Deputy Attorney General, on the brief).

*Marc J. Friedman* argued the cause for appellant, (*Rich & Friedman*, attorneys; *Alan J. Rich* of counsel, *Marc J. Friedman*, on the brief).

*Susan J. Vercheak*, Deputy Attorney General, argued the cause for respondent State of New Jersey Department of Environmental Protection (*John J. Farmer, Jr.*, Attorney General, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel; *Ms. Vercheak*, on the brief).

*Paul Gallagher*, Assistant County Counsel, argued the cause for respondent County of Bergen (*Elizabeth E. Randall*, County Counsel, attorney; *Barbara H. Parker*, on the brief).

*Gabriel M. Ambrosio*, attorney for respondent Borough of Lodi, relied on the briefs of co-respondents.

The opinion of the court was delivered by

WEFING, J.A.D.

These two appeals involve related issues and the same parties; we thus consolidate them for purposes of this opinion. In A–2677–99 National Transfer Inc. (National) appeals from a final order dismissing the complaint in lieu of prerogative writs it had filed in the Superior Court, Law Division, against the New Jersey Department of Environmental Protection (DEP). In A–3257–99, National appeals from a Final Decision of the DEP finding that National was operating a transfer facility in Lodi at substantially in excess of its permitted capacity and assessing fines against National of $1,100,000. We have carefully reviewed the records presented in both appeals and have concluded that the Commissioner's Final Decision should be affirmed in A–3257–99; we have also concluded that the appeal in A–2677–99 should be dismissed, for reasons we will set forth later in our opinion.

We turn first to A–3257–99, for that revolves around the fundamental contested issue: whether National has, indeed, been operating its transfer facility at a capacity beyond that which is legally permitted by DEP. DEP maintains that when it initially granted

National a permit to operate a transfer facility in 1976, it was conditioned upon National accepting no more than eighty tons per day of solid waste. National, on the other hand, contends that it was never informed until 1991 that DEP took the position that it was restricted to eighty tons per day. It also contends that DEP was fully aware from the time National commenced its operations that it was accepting, separating, and transferring solid waste in amounts substantially in excess of that limit and, in consequence, should be estopped from enforcing it now.

Unfortunately, the matter has a complex background, both in terms of its own factual and procedural development, and in terms of the general subject matter of the appeal, involving as it does the solid waste industry in New Jersey. Some of this background must first be set forth in order to permit a proper analysis and understanding of the issues.

The collection and disposal of solid waste in New Jersey has been a closely regulated industry for years. We have long recognized that "the activity of collecting and disposing of solid waste is affected with a public interest...." *In re Application of Saddle River,* 71 *N.J.* 14, 21, 362 *A.*2d 552 (1976). For much of the time frame encompassed by this appeal, DEP was engaged in a comprehensive effort to make New Jersey self-sufficient in the disposal of solid waste. Its efforts in this regard have been set forth in *Borough of Princeton v. Board of Chosen Freeholders of Mercer County,* 333 *N.J.Super.* 310, 316–319, 755 *A.*2d 637 (App. Div.2000) and *Camden County Energy Recovery Assoc. v. Dep't. of Env'l. Prot.,* 320 *N.J.Super.* 59, 726 *A.*2d 968 (App.Div.1999), aff'd. 170 *N.J.* 246, 786 *A.*2d 105 (2001). Some of the actions to which the parties point as evidence in this case were taken as a result of that system, portions of which were struck down as unconstitutional by the Court of Appeals for the Third Circuit in *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County,* 112 *F.*3d 652, 668 (3d Cir.1997), amended, 135 *F.*3d 891 (3d Cir.1998), *cert. den.,* 522 *U.S.* 966, 118 *S.Ct.* 412, 139 *L.Ed.*2d 316 (1997).

In 1975, National applied to DEP for permission to operate a transfer facility at a site it owns on Main Street in Lodi. After reviewing the initial submission, DEP requested further information, including the facility's daily capacity. Fred Holzman, an engineer working on the project on behalf of National, responded thusly:

> The narrative states solid waste to be in the station 15–30 minutes with daily design capacity of 230 cu. yds. The narrative does not state that the compactor will be working continuously; we are asking for a 230 cu. yd. transfer station.

Several months thereafter, on June 23 1976, DEP issued the requested permit, the face sheet of which contains the statement, "It [permission to operate this transfer facility] is subject to all regulations promulgated by this Department and the conditions or limitations listed herein." The face sheet contains no conditions or limitations nor is there any space on the face sheet denominated for that purpose.

DEP asserts that the permit was a two-page document, the second page of which contained various specifications, such as delineating the types of waste which could be accepted at the facility and which could not, and stated rules for the movement of trucks and traffic entering and leaving the facility. In addition, it contained the following language:

> In accordance with the statement contained in a letter dated February 2, 1976 from Mr. Fred Holzman of Bayliss Parsells Engineering, this facility is limited to receiving a maximum of 230 cubic yards (approximately 80 tons) of approved solid waste in any one day.

National, however, contended that it never received this second sheet, despite the fact that DEP mailed the permit to National on three separate occasions, twice in 1976, and once in 1978. National thus asserted it was never aware of the 80 ton per day limitation until 1991.

The 1991 communication from DEP to National was issued in conjunction with efforts on the part of DEP to direct the flow of solid waste in a manner that would achieve financial stability for facilities constructed as part of DEP's efforts to reduce utilization of out-of-state landfills. The resource recovery facility that had

been constructed in Essex County was not generating sufficient income; the DEP issued an Emergency Redirection Order on December 21, 1990 directing that a certain portion of the solid waste generated and collected in Bergen County be transported to Essex County. This order included solid waste that would otherwise have been transmitted through National's Lodi transfer station. In any event, it was immediately apparent that National was delivering to Essex County far more than eighty tons of solid waste per day.

On January 8, 1991, DEP advised National that the emergency directive to utilize Essex County had not removed the eighty-ton-per-day limit contained in its original permit. National insisted that the letter of January 8 was the first notice it had ever received that its transfer facility was subject to such a restriction.

Eventually, in May 1994, DEP, after monitoring National's operations for a period of time, issued an Administrative Order and Notice of Civil Administrative Penalty Assessment based upon sixty-five Notices of Violation for National having exceeding its approved capacity and assessing penalties of $390,000. DEP thereafter issued supplemental Notices of Violations, covering the period March 31, 1994 through December 18, 1995. National disputed the assessments, and the matter was transferred to the Office of Administrative Law as a contested case.

While the matter was pending in the Office of Administrative Law, the County of Bergen began a separate, summary proceeding in the Chancery Division of Bergen County, in which it sought to have penalties assessed against National for its disregard of its maximum permissible capacity. Bergen County had conducted its own investigation of National's operations, and its summary action was based upon dates and incidents separate and independent from those alleged by the DEP in its May 1994 order. DEP then was granted leave to intervene in that summary action for the purpose of transferring it to the Office of Administrative Law and consolidating it with the proceeding pending there. Thereafter, the Borough of Lodi also joined those proceedings.

After a period of discovery, DEP moved for a summary decision. National opposed that motion, arguing that when and how it was advised of the alleged eighty-ton-per-day limit was a contested issue of fact, which could not be resolved on motion. The Administrative Law Judge (ALJ) issued a comprehensive forty-page opinion setting forth her reasons for concluding that the issue could be handled by such a motion, as well as her reasons for concluding that National was bound by the eighty ton limit. She did, however, agree that National was entitled to a plenary hearing on the amount of penalty to be assessed.

The question of penalty was heard in a hearing that took nine days to conclude. Twelve witnesses testified, and sixty exhibits were received in evidence. The ALJ then issued a second opinion, more than twenty pages long, in which she explained her conclusion that a total penalty of $1,100,000 should be assessed, $720,000 of which was payable to DEP, the balance to Bergen County. Lodi had also requested an award of penalties in its favor, but the ALJ denied that request, saying there was no legal basis for such an award. Thereafter, the Commissioner issued a twenty-five page Final Decision affirming the decision of the ALJ. National has appealed from that Final Decision.

On appeal, National contends the following: that summary decision was inappropriate in this case because there was a disputed question of fact; that DEP should be estopped from enforcing the eighty ton limit; that the Commissioner did not have jurisdiction to award penalties in favor of Bergen County; and the amount of the penalties imposed are excessive. We reject those contentions, and thus we affirm.

I

■ Both the ALJ and the Commissioner correctly recognized that the question whether the matter could be decided on a motion for summary decision had to be analyzed in accordance with the principles set forth by the Supreme Court in *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.2d* 146 (1995) ("a

determination whether there exists a 'genuine issue' of material fact that precludes summary judgement requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party."). Not all disputed factual questions necessarily preclude summary judgment; rather, they must be "substantial" in nature. *Brill, supra,* 142 *N.J.* at 529, 666 *A.*2d 146.

■ We agree with the views of the ALJ and the Commissioner. National cannot circumvent the eighty-ton-per-day limitation by simply asserting it never received the second page of the permit. The language on the face sheet, referring to the "limitations or conditions listed herein," was sufficient to put National on notice that its operations were subject to defined terms and conditions. National had a duty to inquire further about the nature of the "limitations or conditions" to which the face sheet referred, and it could not blindly assume that none existed.

The nature of the solid waste National was permitted to accept, as well as prohibited from accepting, was specified on the second page of the permit, not the face sheet. Included among the items National could not accept were hazardous waste containers, junked autos, and tires. If we were to accept National's premise in this case, that it was entitled to accept more than 80 tons per day because it did not receive the second page, logic would require concluding National could reasonably believe that, similarly, it could accept solid waste of any type, with no restrictions of any nature. In our judgment, to state the example demonstrates its absurdity, particularly in the tightly regulated solid waste field which existed at the time. If indeed National did not receive the second page of the permit, it was obligated to inquire further as to the particular "limitations or conditions" governing its operation. Any other conclusion would place a facility which attempted to turn a blind eye in a better position than one which acted

diligently and inquired of DEP. We should not foster such a result.

## II

We consider National's estoppel argument to be similarly unavailing. We note, as did the ALJ, that estoppel should rarely be invoked against a public entity. *W.V. Pangborne & Co. v. N.J. Dep't. of Trans.*, 116 *N.J.* 543, 554, 562 *A.*2d 222 (1989). That is particularly so when estoppel might work to interfere with essential governmental functions. *O'Malley v. Dep't. of Energy*, 109 *N.J.* 309, 316, 537 *A.*2d 647 (1987). As we noted earlier, New Jersey has long considered the regulation of the solid waste industry to be a matter implicating questions of the public interest and welfare. *Saddle River, supra.*

We have reviewed in detail National's factual assertions in support of its estoppel argument. We are satisfied that the most that could be said in favor of National is that, at certain points, one bureau or program within DEP may not have been fully cognizant of the actions and roles of other bureaus or programs. That falls well short of justifying an estoppel, particularly in light of our conclusion that National, if it did not receive the second page of its permit, had a duty to inquire further.

## III

We turn now to the question of the authority of the ALJ and, in turn, the Commissioner, to assess penalties in favor of Bergen County. National stresses that the jurisdiction of the Office of Administrative Law is created by the Administrative Procedure Act, under which a contested case is defined as a dispute with a state agency. *N.J.S.A.* 52:14B–2(a)(b). It also notes that the statutory references within the solid waste management statute to penalties in favor of counties refer to actions in the Superior Court, not the Office of Administrative Law. *N.J.S.A.* 13:1E–9.

■ While there is some surface appeal to National's argument, we are satisfied that, in the context of this matter, the penalties assessed in favor of Bergen County should remain in place. We note that National has already received a plenary hearing on the question of appropriate penalties, a hearing which took nine days to complete. National presented a full case on the issue. It has received the full measure of process to which it would be entitled. We are unable to perceive what benefit might accrue if we were to set aside the determination that National should pay a penalty of $390,000 to Bergen County.

When Bergen County's claim was originally transferred to the Office of Administrative Law, its order to show cause and complaint were dismissed without prejudice. If we were to reverse the penalty determination in favor of Bergen County, the County could simply refile its complaint with the Superior Court and seek to proceed in a summary manner, which could result in National receiving less of a hearing than it has already had. And there would be no reason why, in that further hearing, penalties of an even greater amount could not be assessed against National. While questions of jurisdiction are fundamental, and are not to be resolved on a wholly pragmatic basis, neither should we adopt a result that has no practical benefit to any party and could involve substantial additional expense and delay.

We caution, however, that we reach this conclusion in the context of this case only. We should not be understood as sanctioning a wholesale transformation and enlargement of the jurisdiction of the Office of Administrative Law.

## IV

■ The final issue in A–3257–99 is National's contention that the penalties assessed against it are excessive. We disagree entirely. The ALJ set out in detail the calculation and methodology she employed. It is clear that National operated this facility for a significant period of time in disregard of its capacity limits. Further, it is clear that National, once it was advised of DEP's

position, made a business judgment to proceed as it had in the past. We recognize the limited scope of our review of such a question. We are satisfied that the penalty assessments are entirely appropriate and should be affirmed. *R.* 2:11–3(e)(1)(D).

## V

We turn now to A–2677–99. National filed a complaint with the Law Division in February 1997, in which it alleged that DEP had issued to it a draft permit in January 1997 permitting it to operate at an eighty-ton-per-day limit, despite the fact that DEP recognized that its facility was physically capable of handling 350 tons per day. National sought an order in the nature of mandamus to compel DEP to make a final decision approving its operation at that higher level. In July 1997, DEP answered and counterclaimed, alleging that National was responsible for certain regulatory violations in connection with its operation of this facility. DEP included among its affirmative defenses that the trial court lacked subject matter jurisdiction.

*R.* 4:6–3 calls for the defense of lack of subject matter jurisdiction to be raised before the trial court within ninety days of the answer, obviously with an eye to the swift resolution of such a fundamental question. Not until nearly two years after its answer, however, did DEP finally file such a motion with the trial court, arguing the matter belonged before this court under *R.* 2:2–3(a)(2).

The trial court agreed that the substance of National's complaint was a challenge to a final decision of the DEP which properly should be brought before this court. The trial court concluded that DEP had acted on National's application by issuing a draft permit for 80 tons per day as opposed to the requested 350 tons per day. Ordinarily, the relief to be granted in such an instance is the transfer of the complaint, pursuant to *R.* 1:13–4. *Mutschler v. Dep't of Envtl. Prot.,* 337 *N.J.Super.* 1, 10, 766 *A.2d* 285 (App.Div.2001).

If a challenge to the action or inaction of a state administrative agency is brought in a trial court, that court has the responsibility to transfer the matter to this court on the motion of a party or "on its own initiative." *R.* 1:13-4(a). If a trial court fails to transfer a challenge to state agency action to this court and instead decides the merits, we may exercise our original jurisdiction on appeal from the judgment and review the underlying agency action as if the challenging party had appealed directly to his court.

Here, however, the trial court dismissed the complaint with prejudice. While the trial court may have technically erred in doing so, it does not necessarily follow, however, that National Transfer is entitled to substantive relief.

In December 1991, National filed an application to renew its permit to operate its transfer facility. The renewal application stated the capacity to be 350-tons-per day. National took the position this was a routine renewal application, reflecting the capacity at which it had been operating for some years. DEP, however, took the position this was an application to operate at a significantly increased capacity and, as such, required the approval of Bergen County. In January 1997, DEP issued a draft permit for eighty-tons-per-day because Bergen County had not yet approved the increase. The purported object of the prerogative writs complaint was to compel DEP to act upon the request for a 350-ton-per-day limit. As the trial court noted on dismissing National's complaint, DEP had acted; its approval of an eighty-ton-per-day capacity was a rejection of a 350-ton-per-day limit.

It is apparent from oral argument that there have been, while this appeal was pending, several subsequent steps taken at the county level. The pleadings and the briefs which were filed do not at all reflect these subsequent developments. These ongoing developments would appear to indicate that the matter is not ready for review, at least in the present posture. We therefore dismiss the appeal, without prejudice.

In summary, in A–3257–99 we affirm the Final Decision of the Commissioner and dismiss A–2677–99 without prejudice.