SABATINO, P.J.A.D.
*406 *427 The interlocutory appeal and cross-appeal in this medical malpractice and wrongful death case concern timeliness issues. The issues arise out of two facets of the Law Division motion judge's March 17, 2017 decision. First, the judge held that the fictitious pleading process under Rule 4:26-4 did not justify plaintiff's addition of three defendant physicians to the lawsuit after the statute of limitations had run. Second, despite plaintiff's unsuccessful reliance upon the fictitious pleading rule to toll the limitations period, the court equitably estopped the three physicians from obtaining dismissal of the claims against them. The court found those defendants had unduly delayed in moving for such dispositive relief after about a year of costly discovery had occurred.
*428 On leave granted, the three physicians appeal the trial court's equitable estoppel ruling, while plaintiff cross-appeals the court's fictitious pleading decision.
For the reasons that follow, we reverse the court's fictitious pleading determination as to one of the three co-defendants. We do so because decedent's hospital records do not legibly reveal that particular doctor's name and involvement in decedent's care. It was unreasonable to expect plaintiff to have ascertained that doctor's identity and negligent conduct until her counsel received a post-suit affidavit from the defense clarifying which doctors had actually been involved in decedent's care. Upon receiving the clarifying affidavit, plaintiff promptly amended the complaint to name the previously unidentified doctor (and two other doctors) in place of "John Doe" defendants. Plaintiff's claims against that particular physician therefore may proceed.
We affirm, however, the trial court's fictitious pleading ruling as to the other two co-defendants who were added late. Plaintiff could have reasonably ascertained, before the statute of limitations expired, the respective identities and involvement in decedent's care of those two doctors.
As an important caveat, we allow plaintiff's claims to proceed against one or both of those two late-added doctors insofar as they may have acted as the decedent's "attending physician." We do so because the hospital records misleadingly and erroneously identified a different doctor, who was actually on vacation at the time, as decedent's attending physician.
Lastly, we overturn the trial court's application of principles of equitable estoppel disallowing the dismissal of the two other doctors. In the absence of a case management order or court rule prescribing an earlier deadline for filing such a motion, or an express misrepresentation made to plaintiff, those defendants did not forfeit their rights to file a limitations-based dismissal motion near the very end of the discovery period. Accordingly, we reverse the denial of summary judgment with respect to those two defendants, subject to the "attending physician" caveat.
*429 I.
Since this case has not been tried, our discussion of the facts is necessarily tentative and incomplete. Our focus is largely *407 on the procedural chronology that bears upon the critical timeliness issues presented.
On the evening of March 28, 2013, plaintiff's decedent Freddy A. Baez, who was then in his thirties, appeared at the emergency room at Clara Maass Medical Center.[1] He complained of persisting left leg swelling, leg pain, fever, and other symptoms. Decedent was provided with fluids and medication. Blood work and other tests were performed. Decedent briefly was placed in a rapid diagnostic unit, where he was further evaluated and monitored. He then was admitted to a medical floor of the hospital early the next day, March 29.
A physician working at the hospital, Andrey Silkov, M.D.,[2] examined decedent on March 29. In Dr. Silkov's typewritten two-page "History and Physical" report, he described decedent's symptoms and complaints. The report noted the patient's "morbid obesity." The report further noted the patient had a history of a previous "left lower extremity DVT" (an abbreviation for a deep vein thrombosis ).
In his written plan on admission, Dr. Silkov stated the patient would be administered intravenous antibiotics and two other medications. The plan included a request to have the patient evaluated by an infectious disease specialist. The report was electronically "signed" by Dr. Silkov. The doctor's full name is typewritten in three places at the bottom of the report.
Over the next several days, decedent was seen and treated at Clara Maass by several doctors and other health care providers.
*430 The hospital's records for that time frame, to the extent they have been supplied to us in the appendices, contain a mixture of typewritten documents and handwritten progress notes. The handwritten notes are replete with illegible words, medical jargon, abbreviations, and indecipherable signatures.[3]
The earliest handwritten entry from decedent's hospital chart reproduced in the parties' appendices is dated March 29, 2013. As translated, the first narrative line of that entry states "Admit to Medicine Dr. J. Paulo." The "Dr. J. Paulo" in that entry refers to Jimmy M. Paulo, M.D. Many of the other entries in decedent's chart refer to Dr. Paulo. In fact, plaintiff's counsel represents, without contradiction by defense counsel, that Dr. Paulo's name appears about seventy-five times within those records.
Typewritten portions of the records additionally refer to Dr. Wayne J. Caputo, a consulting podiatrist who examined decedent at the hospital. Names of other doctors also appear. Some of them are handwritten and illegible, and others are either typed or in legible handwriting.
Decedent was discharged from Clara Maass on April 3, 2013. His discharge summary is set forth on a typed one-page report. The report's heading identifies decedent's attending doctor as "Jimmy Paulo, M.D." The report was electronically signed by Seong Choi, M.D., with copies to *408 Dr. Caputo, Dr. Choi, and another physician named Dr. Donald Beggs.[4]
The discharge summary relates that decedent had been admitted to the hospital for left lower extremity cellulitis with a left hallux lesion. It recounts that decedent had an x-ray of his toe, *431 which showed no evidence of acute osseous pathology, and that hospital personnel had performed a debridement on the toe. The discharge plan called for follow up with decedent's primary care physician within two weeks, and with the podiatrist, Dr. Caputo, within one week.
On April 16, 2013, thirteen days after his discharge from Clara Maass, Mr. Baez died of a pulmonary embolism at his home. An autopsy was performed. Decedent's family thereafter retained counsel, who obtained and reviewed decedent's hospital records.
Three days before the two-year statute of limitations expired, plaintiff Marian A. Baez, as administrator of her son Freddy's estate and individually, filed this medical malpractice action in the Law Division on April 13, 2015. The complaint asserted claims for both wrongful death and survivorship damages. The complaint named Dr. Paulo, Dr. Caputo, and five fictitious defendants denominated as "John Does" one through five. The complaint described the five John Does as "physicians licensed to practice in the State of New Jersey" who were involved in decedent's care.
Plaintiff's claims of medical negligence focus on the diagnosis and treatment decedent received at Clara Maass during the five-day period after his admission and before his discharge. Plaintiff alleges decedent was at high risk for a DVT. Because of that risk, the medical standard of care allegedly required decedent to receive at the hospital "pharmacologic" venous thromboembolism ("VTE") prophylaxis medications, rather than "mechanical" prophylaxis such as stockings or intermittent pneumatic compression.
Decedent did not receive VTE prophylaxis at the hospital. According to plaintiff, this omission allowed decedent to develop a blood clot in his leg. The clot traveled to his lungs, causing a fatal pulmonary embolism.
After Dr. Paulo and Dr. Caputo each filed answers denying liability, defense counsel on October 16, 2015 sent plaintiff's counsel an affidavit from Dr. Paulo. The affidavit attests to Dr. Paulo's lack of involvement in decedent's care. According to his affidavit, *432 Dr. Paulo was away on vacation the week that decedent was in the hospital. The affidavit explains that Dr. Paulo's name appeared automatically on decedent's records for administrative reasons, because decedent had been admitted to a medical practice group headed by Dr. Paulo.
The affidavit informed plaintiff's counsel that the Clara Maass hospitalists in Dr. Paulo's group who actually saw decedent during his stay were Dr. Silkov, Dr. Choi, and a third physician, Sacha Balmir, D.O. Unlike those other two doctors, Dr. Balmir's name is not typed or legibly written on any of the hospital records.
Plaintiff's counsel spoke with defense counsel a few days later. He agreed to enter into a stipulation of dismissal as to Dr. Paulo, but requested that defense counsel identify the authors of various illegible handwritten notes in decedent's hospital chart. Defense counsel agreed to do so.
*409 In a subsequent letter dated November 3, 2015, defense counsel confirmed that Drs. Silkov, Balmir, and Choi had treated decedent at the hospital. She elaborated that Dr. Silkov had admitted the patient on March 29, 2015, that Dr. Balmir had seen him on March 30 and 31, and that Dr. Choi had discharged him on April 3. Defense counsel reiterated that Dr. Paulo's name had appeared on decedent's chart only "as a matter of routine."
Upon receiving this information, plaintiff executed a stipulation of dismissal as to Dr. Paulo. Concurrently, plaintiff moved for leave to amend the complaint to insert Drs. Silkov, Balmir, and Choi as defendants in place of the previously-designated "John Doe" defendants. On November 20, 2015, the trial court granted that motion, which was unopposed.[5]
The newly-added defendant physicians filed a joint answer denying the allegations of malpractice. The answer listed various *433 affirmative defenses, including non-compliance with the statute of limitations.
Plaintiff procured the necessary affidavit of merit regarding the three added defendants. In addition, plaintiff relied upon an expert report from a professor at the Harvard Medical School.[6] The expert opined the physicians who treated decedent deviated from professional standards of care at the hospital, in failing to sufficiently guard against decedent sustaining a DVT. He contended this failure was a causal factor in the patient's post-discharge death.
Discovery thereafter continued. In March 2016, defendants provided responses to plaintiff's interrogatories, which included the aforementioned transcriptions of the handwritten entries in decedent's chart. That same month, defendants deposed plaintiff, the only deposition they initiated. Plaintiff's counsel took five depositions: Dr. Caputo in April 2016; Dr. Balmir and Dr. Silkov in May 2016; and Dr. Paulo (as a fact witness) and Dr. Choi in October 2016. Plaintiff also supplied the defense in November 2016 with an updated version of her expert's report, which specifically names and discusses, among other things, the conduct of Drs. Silkov, Balmir, and Choi.
After he was deposed, Dr. Caputo moved for summary judgment. Plaintiff did not oppose the motion, because she had received the opinion of an expert in podiatry concluding that Dr. Caputo had not deviated, in fact, from the standards of care. The three other defendants partially opposed the motion, seeking to preserve their cross-claims against Dr. Caputo for contribution and indemnification. The trial court accordingly granted summary judgment as to Dr. Caputo only as to plaintiffs' claims, thereby preserving the co-defendants' cross-claims against him.
In September 2016, defendants moved to set a date certain for the production of expert reports and to extend discovery for a *434 period of ninety days. Plaintiff partially agreed that additional discovery was warranted, but only requested two additional weeks to serve expert reports. Defendants thereafter requested another thirty days of discovery in order to complete four expert depositions. The court extended the discovery period to mid-February 2017, ordering plaintiff's additional expert reports to be served by December 1, 2016, defendants' expert reports to be *410 served by January 15, 2017, and expert depositions to be completed by February 13, 2017.
Before the extended discovery end date expired, Drs. Silkov, Balmir, and Choi moved in January 2017 for summary judgment, seeking dismissal of the claims against them based upon the statute of limitations. Plaintiff countered that her claims against the three physicians were timely. She argued the amended complaint she had filed in December 2015-with leave of the court and without opposition-should "relate back" to her original April 2015 complaint naming "John Doe" defendants.
After hearing two sessions of oral argument, the motion judge declined to dismiss the claims against the three co-defendants. In his oral opinion, the judge first addressed the timeliness issues posed by plaintiff's use of fictitious parties in her original complaint. The judge concluded in this regard that plaintiff had not acted with reasonable diligence to investigate the roles of the three doctors sooner, given the information appearing on the hospital records. The judge reasoned as follows:
I don't believe the [f]ictitious [pleading] [r]ule applies in this particular case because the identities of the individuals were known to the [p]laintiffs before the lawsuit was filed. Only one potential exception was Dr. Balm[ir], but I'm going to accept the defense position that there was a way, had the [p]laintiff been diligent, to identify Dr. Balm[ir]. So, I don't find that the [f]ictitious [p]leading [r]ule in this case applies because the identities were known.
Consequently, the judge ruled that plaintiff's claims against Drs. Silkov, Balmir, and Choi, which were filed more than two years after decedent's treatment at the hospital and death, did not "relate back" to her earlier April 2015 fictitious pleading.
*435 The judge then turned to a second question of whether defendants' own delay-in not moving to dismiss the amended complaint as time-barred until about a year of discovery had been conducted-precluded them from receiving the relief of dismissal. On this question, the judge ruled in favor of plaintiff and invoked principles of equitable estoppel.
The judge observed the three physicians were clearly "active participa[nts] in the defense" of the case, without them voicing any objection. The judge further noted the apparent absence of "any information" bearing on the statute of limitations "gleaned from the discovery that took place in the ensuing 13 months that would have not been available to [defendants] in November of 2015 ...." As the judge stated in this ruling:
although I understand the defense in saying that they never would have moved to dismiss so early until discovery was over, in this particular case, discovery didn't add anything to what they already knew [i]n November of 2015, which was the three defendants were in the [hospital] record, identified as such doctors having some responsibility over the decedent and realizing that they were not originally in the complaint that was filed two days before the statute expired.
The judge reasoned that, in instances where-as he found here-defendants actually know of the claims being asserted against them, no significant prejudice from their ongoing inclusion in a case redounds to their detriment. In such a context, the judge observed, the policy reasons for strictly applying a statute of limitations recede.
Citing principles of equitable estoppel set forth in the Supreme Court's opinion in *411 W.V. Pangborne & Co. v. N.J. Dep't of Transp., 116 N.J. 543, 557, 562 A.2d 222 (1989), the judge held those principles must apply here to prevent the injustice of a limitations period being too strictly applied. Consequently, he ultimately declined to dismiss the claims against all three defendants.
We granted leave to appeal to defendants as to the trial court's estoppel ruling, and to plaintiff as to the fictitious pleading ruling. We shall discuss those rulings in reverse sequence.
In conducting our review, we consider the motion record and the legal issues de novo.
*436 Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 349-50, 142 A.3d 742 (2016). The question as to whether a statute of limitations applies in a given case is ordinarily a legal matter and "traditionally within the province of the court." Lopez v. Swyer, 62 N.J. 267, 274, 300 A.2d 563 (1973). To the extent we have to reach the estoppel issue depending on the outcome of the first issue, we accord substantial deference to the trial court's equitable authority. Feigenbaum v. Guaracini, 402 N.J. Super. 7, 17, 952 A.2d 511 (App. Div. 2008). Even so, we must remain mindful of how such equitable authority is to be fairly exercised within our State's overall pretrial system of civil litigation, and the associated values of predictability and uniformity of practice.
II.
Statutes of limitations seek to prevent the injustice of "compel[ling] a person to defend a law suit long after the alleged injury has occurred, when memories have faded, witnesses have died[,] and evidence has been lost." Lopez, 62 N.J. at 274, 300 A.2d 563. The principal consideration underlying the enactment and enforcement of statutes of limitations is one of fairness to defendants. Ibid.
As the Supreme Court has repeatedly explained, statutes of limitations are designed to
penalize dilatoriness and serve as measures of repose. When a plaintiff knows or has reason to know that he has a cause of action against an identifiable defendant and voluntarily sleeps on his rights so long as to permit the customary period of limitations to expire, the pertinent considerations of individual justice as well as the broader considerations of repose, coincide to bar his action.
[ Kendall v. Hoffman-La Roche, Inc., 209 N.J. 173, 191, 36 A.3d 541 (2012) (quoting Farrell v. Votator Div. of Chemetron Corp., 62 N.J. 111, 115, 299 A.2d 394 (1973) )(emphasis added).]
Conversely, if a plaintiff "does not know or have reason to know that he has a cause of action against an identifiable defendant until after the normal period of limitations has expired, the considerations of individual justice and the considerations of repose are in *437 conflict and other factors may fairly be brought to play." Ibid. (emphasis added).
The applicable statute of limitations for a survivorship action is two years following the death of the decedent. N.J.S.A. 2A:15-3. A two-year statute of limitations, measured from the date of death, also applies to claims brought under New Jersey's Wrongful Death Act, N.J.S.A. 2A:31-1 to -6. N.J.S.A. 2A:31-3 ; LaFage v. Jani, 166 N.J. 412, 416, 766 A.2d 1066 (2001).
It is undisputed that plaintiff's original complaint, which she filed on April 13, 2015, complied with this two-year deadline. The parties instead dispute whether that two-year period was properly extendable here through plaintiff's use of fictitious "John Doe" names in her complaint under Rule 4:26-4.
*412 Rule 4:26-4 provides, in pertinent part, that:
[i]n any action, irrespective of the amount in controversy, other than an action governed by R. 4:4-5 (affecting specific property or a res), if the defendant's true name is unknown to the plaintiff, process may issue against the defendant under a fictitious name, stating it to be fictitious and adding an appropriate description sufficient for identification. Plaintiff shall on motion, prior to judgment, amend the complaint to state defendant's true name, such motion to be accompanied by an affidavit stating the manner in which that information was obtained.
[ (Emphasis added).]
The Supreme Court has construed Rule 4:26-4 to allow "a plaintiff who institutes a timely action against a fictitious defendant to amend the complaint after the expiration of the statute of limitations to identify the true defendant." Viviano v. CBS, Inc., 101 N.J. 538, 548, 503 A.2d 296 (1986). When this procedure is properly utilized, "an amended complaint identifying the defendant by its true name relates back to the time of filing of the original complaint ...." Ibid. (emphasis added).
In Viviano, the plaintiff was injured while working a record album press at a plant where she worked. Id. at 542, 503 A.2d 296. The plaintiff sued one defendant, CBS, and used the fictitious pleading rule to separately name as John Doe defendants the manufacturer, installer, and distributor of the press. Id. at 542-43, 503 A.2d 296. After receiving a list of component part manufacturers *438 from defense counsel and engaging a second expert to determine which of the companies had actually manufactured the press, plaintiff amended her complaint to substitute the true name of the manufacturer after the limitations period had expired. Id. at 543, 503 A.2d 296. The Court deemed the amended complaint in those circumstances to relate back to the original complaint. Id. at 556, 503 A.2d 296. The Court noted the late-added manufacturer's acknowledgment that it was not prejudiced by plaintiff's delayed filing. Ibid.
Likewise, in Farrell, a factory employee was injured while cleaning a machine. 62 N.J. at 113, 299 A.2d 394. The employee used the fictitious pleading rule to name as John Doe defendants the "assembler, supplier or seller of the machine which caused [his] injuries." Ibid. As soon as the plaintiff learned the true identity of the machine's manufacturer, his counsel applied to amend the complaint accordingly. Id. at 114, 299 A.2d 394. Thereafter, the manufacturer moved to set aside the order amending the complaint, on the grounds that it violated the statute of limitations. Ibid.
The Court ruled in Farrell that the fictitious-name practice of Rule 4:26-4 saved the amended complaint from the bar of the statute of limitations. Id. at 122-23, 299 A.2d 394. The Court reasoned this was the appropriate outcome because "[t]here [wa]s no suggestion that the lapse of time has resulted in loss of evidence or impairment of [the] ability to defend; nor is there any suggestion that the plaintiffs have been advantaged by it." Ibid.
At the same time, case law has emphasized the need for plaintiffs and their counsel to act with due diligence in attempting to identify and sue responsible parties within the statute of limitations period. See, e.g., Matynska v. Fried, 175 N.J. 51, 52-54, 811 A.2d 456 (2002) ; Claypotch v. Heller, Inc., 360 N.J. Super. 472, 479-80, 823 A.2d 844 (App. Div. 2003). Rule 4:26-4 may only be used by a plaintiff "if a defendant's true name cannot be ascertained by the exercise of due diligence prior to filing the complaint."
*413 Claypotch, 360 N.J. Super. at 479-80, 823 A.2d 844 (citations *439 omitted). "To be entitled to the benefit of the rule, a plaintiff must proceed with due diligence in ascertaining the fictitiously identified defendant's true name and amending the complaint to correctly identify that defendant." Id. at 480, 823 A.2d 844 (emphasis added) (citations omitted).
In essence, a plaintiff relying on a fictitious pleading must demonstrate two phases of due diligence in order to gain the tolling benefits of the rule. Ibid. First, a plaintiff must exercise due diligence in endeavoring to identify the responsible defendants before filing the original complaint naming John Doe parties. Ibid. Second, a plaintiff must act with due diligence in taking prompt steps to substitute the defendant's true name, after becoming aware of that defendant's identity.[7] Ibid.
In Matynska, the Court considered a medical malpractice case brought by a plaintiff who had suffered complications after surgery. 175 N.J. at 52, 811 A.2d 456. She alleged those complications occurred because of negligent post-operative treatment. Ibid. The plaintiff filed her original complaint against the hospital, several doctors and nurses, along with "John Doe, M.D. and Jane Doe, R.N." Ibid.
One of the doctors not identified in the complaint had treated the plaintiff when covering for one of his surgeon partners. Ibid. However, the doctor's name had appeared in the hospital records available to plaintiff before the lawsuit was filed. Ibid. The plaintiff claimed she did not know that doctor "was in any way responsible for her treatment because she never met him, was not advised that he would be covering for [another doctor], and because the brief and vague hospital chart references to [this doctor] did not disclose his role in her care and treatment." Ibid.
Two years after filing her civil action, the plaintiff in Matynska moved to amend the complaint to substitute the treating doctor's real name for John Doe, M.D., pursuant to Rule 4:26-4.
*440 Id. at 53, 811 A.2d 456. The trial court denied the motion to amend. Ibid. We affirmed that denial, agreeing the plaintiff had failed to undertake adequate investigation and preparation before filing her original complaint. Ibid.
The Supreme Court thereafter likewise affirmed, reasoning that the plaintiff's "efforts to discover the role of all parties complicit in her injury were wholly inadequate at least insofar as [this doctor was concerned]." Ibid. The hospital records included the defendant-doctor's name twice, describing him as a physician who had participated in the plaintiff's care. Ibid. The Court observed that a cursory glance in a telephone book, a call to another identified doctor, or a call to the hospital would have "uncovered [the defendant-doctor]'s status as a partner of [the previously identified doctor], thus alerting [the plaintiff] to his role." Ibid.
The Court held in Matynska that the plaintiff had a duty "to investigate all potentially responsible parties in a timely manner but did not do so." Id. at 54, 811 A.2d 456. Given the circumstances, the Court concluded the plaintiff had failed "to cross the due diligence threshold ...." Ibid. Having not fulfilled her "primary obligation to investigate" the defendant-doctor's involvement, the plaintiff had no right to amend her complaint under Rule 4:26-4 after the statute of limitations had run. Ibid. Notably, the Court's brief opinion in Matynska does not mention whether the defendant had shown any prejudice from the plaintiff's late filing. Ibid.
*414 By contrast, we found a plaintiff had exercised due diligence in Worthy v. Kennedy Health Sys., 446 N.J. Super. 71, 140 A.3d 584 (App. Div.), certif. denied, 228 N.J. 24, 154 A.3d 165 (2016), another medical malpractice case. The plaintiff's timely-filed original complaint in Worthy asserted claims against the hospital where she had received treatment, along with various other named defendants. Id. at 81, 140 A.3d 584. She also pled claims against several other nurses and doctors "whose specific identities were not determined because plaintiff was unable to decipher their signatures on certain medical reports." Ibid. For more than fifteen *441 months, the hospital stalled in providing the plaintiff with the requested identification of the other nurses and doctors who had treated her. Id. at 91, 140 A.3d 584. Eventually, the hospital supplied the names. Id. at 90, 140 A.3d 584. The plaintiff promptly moved to amend her complaint to add a physician as a defendant to her complaint within days of receiving his identifying information from the hospital. Ibid.
The substituted defendant in Worthy moved for summary judgment, arguing the plaintiff's claim against him was barred by the statute of limitations and her incorrect use of the fictitious pleading rule. Id. at 83, 140 A.3d 584. The trial court agreed, and dismissed the claims against that doctor. Ibid.
On appeal in Worthy, we reversed. We found the doctor-defendant's true identity had remained unknown, not because the plaintiff had been dilatory, but because the hospital-defendant had "continually thwarted" her disclosure requests. Id. at 91, 140 A.3d 584. We distinguished the situation in Worthy in this regard from Matynska. Id. at 90, 140 A.3d 584. We noted that in Matynska, the "plaintiff failed to investigate potential claims against a physician whose name appeared multiple times in her medical chart." Ibid. By contrast in Worthy, "the names were not easily obtained from the medical records and [the defendant hospital] was not forthcoming in providing actual identifications." Ibid.
A.
Guided by these precedents, the fictitious pleading analysis here primarily turns upon an assessment of whether plaintiff acted with due diligence before the statute of limitations period ended on April 16, 2015. We agree with the motion judge's finding that plaintiff was not sufficiently diligent, but solely with respect to Dr. Silkov, the admitting physician, and Dr. Choi, the discharging physician. The names of both of those doctors were clearly typed on their respective reports within decedent's chart. The reports set forth their observations of the patient, the treatments or tests he had received, and what further treatment and follow up *442 was planned. There was no need for a handwriting analysis or translation, at least as to those typed records. In fact, plaintiff moved for leave to add them to the complaint before even receiving the handwriting transcriptions.
We recognize the translations the defense ultimately supplied in discovery reflect that Drs. Silkov and Choi authored or were also mentioned elsewhere in handwritten notations in decedent's chart. But that does not excuse plaintiff from omitting them from the lawsuit or from failing to make diligent inquiry about their roles before the statute of limitations ran.
The fact that Dr. Paulo was misidentified in the chart as decedent's attending physician did not relieve plaintiff from investigating and pursuing theories of liability against Dr. Silkov and Dr. Choi in a timely and diligent manner to the extent they may have been involved as "non-attending"
*415 doctors. Their identities and participation in decedent's care were known before the statute ran.
We reject plaintiff's explanation that the alleged deviations from professional standards by Drs. Silkov and Choi were confined to events that took place only after decedent's admission but before his discharge. Indeed, among other things, plaintiff's expert's amended report criticizes Dr. Silkov for treatments that were not prospectively ordered at the time of the patient's admission, and Dr. Choi for treatments that were not completed or prescribed before decedent was sent home. We agree with the motion judge that plaintiff could have named these two doctors as defendants before the April 16, 2015 deadline, or at least sought more information about them, pre-suit, from the hospital.
That said, we inject an important caveat. As we have noted, the hospital chart falsely stated that Dr. Paulo was decedent's "attending physician." As defined in various sources, an attending physician is a doctor "serving as a physician or surgeon on the staff of a hospital or similar health-care facility and having primary responsibility over the treatment of a patient and often *443 supervising treatment given by interns, residents, and fellows[.]" Merriam-Webster's Dictionary (2018), https://www.merriam-webster.com/dictionary/attending (last visited Feb. 20, 2018) (emphasis added).[8] We agree with plaintiff that, before receiving Dr. Paulo's post-suit clarifying affidavit, she and her counsel would have had reason to presume the truth of the hospital records' explicit designation of Dr. Paulo as decedent's attending physician, and thus the doctor who had primary responsibility for his overall care. Plaintiff did not fail to exercise due diligence in maintaining that belief until she was served with Dr. Paulo's affidavit correcting the misimpression.
Accordingly, to the extent her present theories of liability against Dr. Silkov or Dr. Choi may be specifically based on either of those doctors serving at any time as decedent's "attending physician"[9] who was charged with primary responsibility for the overall supervision of his care at the hospital, those claims may proceed, depending upon the particular duties involved. See Tobia v. Cooper Hosp. Univ. Med. Center, 136 N.J. 335, 346, 643 A.2d 1 (1994). Conversely, plaintiff's claims against Drs. Silkov and Choi that do not hinge upon the alleged status and specific duties of an *444 attending physician are time-barred. Any dispute in applying this caveat shall be addressed by the trial court on remand. *416 We now turn to the subject of prejudice. Although the implicit prejudice to Dr. Silkov and Dr. Choi caused by their late substitution into the case may not have been significant, they nonetheless had a justifiable expectation to not be sued after the two-year limitations period expired.[10] The fictitious pleading rule is not an appropriate device to avoid naming known parties in a timely fashion.
To be sure, we by no means endorse the "scattershot" naming in a malpractice complaint of every doctor whose name may appear in a patient's hospital chart. Such indiscriminate overinclusion would be contrary to public policy. See, e.g., N.J.S.A. 2A:53A-26 to -29 (requiring an affidavit of merit to support malpractice cases against doctors and other specified licensed professionals); N.J.S.A. 2A:15-59.1 (disallowing frivolous pleadings). Reasonable due diligence by a plaintiff should not be equated with overzealous litigiousness. We are satisfied that the motion judge correctly recognized and applied these concepts in finding that plaintiff should have been more diligent with respect to naming Drs. Silkov and Choi in the original complaint, subject to the caveat we have expressed regarding their potential status as attending physicians.
B.
We reach a different conclusion as to Dr. Balmir. As we have noted, his name is not typed in any of the records. His name *445 and signature only appear in illegible handwritten entries within the chart. This is not acceptable institutional practice. See N.J.A.C. 8:43G-15.2(b) (requiring "all entries" in a patient's medical record to be "written legibly" or authenticated if a computerized medical records system is used). Until receiving Dr. Paulo's clarifying affidavit, plaintiff had no reason to be aware that Dr. Balmir had anything to do with her son's treatment. There was no lack of due diligence in omitting him from her original complaint. The motion judge erred in disallowing plaintiff to substitute Dr. Balmir in place of a John Doe defendant.[11] We reject the defense's argument that the John Doe description in the complaint was insufficiently detailed to allow that substitution.
Consequently, we reverse this aspect of the judge's decision. The case against Dr. Balmir shall proceed on remand.
III.
Our disposition of the fictitious pleading issues concerning Dr. Silkov and Dr. Choi makes it necessary for us to reach the judge's equitable estoppel ruling as to them.
We are cognizant that statutes of limitations should not be mechanically applied, and that equitable considerations sometimes rightly play a role in tempering their application. "It is now well settled in New Jersey that statutes of limitation will *417 not be applied when they would unnecessarily sacrifice individual justice under the circumstances." Zaccardi v. Becker, 88 N.J. 245, 258-59, 440 A.2d 1329 (1982). "A just accommodation of individual justice and public policy requires that in each case the equitable claims of opposing parties must be identified, evaluated and weighed. Whenever dismissal would not further the Legislature's objectives in prescribing the limitation, the plaintiff should be given an opportunity to assert his claim." *446 Galligan v. Westfield Centre Serv., Inc., 82 N.J. 188, 193, 412 A.2d 122 (1980) (emphasis added) (citations omitted).
In Zaccardi, the Supreme Court held that, under the distinctive circumstances presented, the defendants were equitably estopped from asserting the statute of limitations as an affirmative defense because their own conduct had "contributed to the delay ...." Zaccardi, 88 N.J. at 260, 440 A.2d 1329. The defendants there engaged in especially dilatory and egregious behavior, by failing to alert the trial court that a first complaint in the case previously had been dismissed, and by nonetheless taking part in the continued litigation. Id. at 257-58, 440 A.2d 1329. The Court reasoned that, "Having thus significantly contributed to the delay in adjudicating this case, [defense counsel] cannot now claim on behalf of his clients that the case is stale and ought not to be heard." Id. at 258, 440 A.2d 1329. Hence, the plaintiffs' interests in obtaining an adjudication on the merits in Zaccardi outweighed the defendants' right to assert a belated statute of limitations defense. Id. at 258, 440 A.2d 1329.
Where a statute of limitations is used as a sword, rather than a shield, by someone with a duty to disclose information, then "factors of vicarious enrichment become a dominant consideration which [courts] are prone to remedy in equity and good conscience." Id. at 256, 440 A.2d 1329 (citing State v. U.S. Steel Corp., 22 N.J. 341, 358-59, 126 A.2d 168 (1956) ). We acknowledge that general equitable proposition, but find it inapplicable here to preclude Dr. Silkov and Dr. Choi from obtaining dismissal of untimely claims asserted against them.
Defendants pled the statute of limitations as an affirmative defense with their answer. Unlike certain other specified defenses-such as defective service of process and lack of personal jurisdiction-which must be raised by motion within ninety days after service of an answer, see Rule 4:6-3, the Rules of Court impose no deadline on the filing of a dismissal motion based on the statute of limitations. Although the Supreme Court has observed that such a dismissal motion ought to be filed before trial, see *447 Knorr v. Smeal, 178 N.J. 169, 176, 836 A.2d 794 (2003), there is no case law or Court Rule that sets forth a filing deadline.
Undoubtedly, the trial court could have specified in a case management order a reasonable deadline for the filing of any dismissal motion invoking the statute of limitations. But we are advised that no case management conference was conducted in this medical malpractice case during the discovery period.[12]
*418 In the absence of a known deadline, defendants had reason to presume they could wait to file such a motion until the end of the discovery period. As far as we can tell from the record, defendants did not make any overt representations designed to lull or mislead plaintiff into a false sense of security that the statute of limitations defense they had pled with their answer was mere boilerplate. See W.V. Pangborne & Co., 116 N.J. at 555, 562 A.2d 222 (focusing on whether misleading conduct occurred that could justify the application of equitable estoppel to a litigant).
We appreciate that in some cases continued discovery can reveal facts that may bear upon whether a plaintiff was justified by tolling principles in delaying suit against or naming a particular defendant. See Lopez, 62 N.J. at 274-76, 300 A.2d 563 (analogously discussing the fact-dependent aspects of equitable tolling). But we concur here with the motion judge that, in retrospect, the discovery conducted after plaintiff's deposition was completed in March 2016 does not seem to have been germane to the statute of *448 limitations issues. Even so, no motion filing deadline was specified and none was violated.
We share the concerns of the motion judge and plaintiff that some time and expense was expended improvidently[13] in the case as the result of defendants' delay in not moving for dismissal sooner. Even so, we are not convinced defendants should be equitably estopped or otherwise barred from bringing that motion, as they did, near the end of the discovery period. We reach that conclusion despite the fact that defendants themselves had procured a discovery extension from the court.
We would conclude to the contrary if a Rule of Court or a case management order in this case had specified a motion filing deadline. Without such a fixed and announced deadline, however, or an affirmative misrepresentation they would not file a motion, we hold it would be unfair to Drs. Silkov and Choi in these circumstances to allow time-barred claims against them to proceed.[14] Moreover, if we were to uphold the estoppel ruling in this case, our decision might produce widespread uncertainty in other cases about how soon a statute of limitations motion needs to be filed, and perhaps spark premature motion practice lacking a suitably developed record.
For these reasons, we reverse the trial court's estoppel ruling and order the dismissal of plaintiff's claims against Dr. Silkov and Dr. Choi from this case, subject to the "attending physician" caveat.
*449 IV.
The trial court's March 17, 2017 order is affirmed in part and reversed in part, consistent with the terms of this opinion. We *419 remand for further proceedings in the trial court and do not retain jurisdiction.

The hospital has not been named in this case as a defendant, nor as a third-party defendant.

At times the briefs refer to Dr. Silkov, and the other two late-added co-defendants, as "hospitalists."

Ultimately, after the lawsuit was filed, the defense supplied plaintiff's counsel in March 2016 with requested transcriptions of the handwritten notes, as part of defendants' interrogatory responses. We note the transcriptions were furnished about four months after plaintiff had already amended the complaint to name the three additional physicians as defendants.

The role of Dr. Beggs, who has not been named as a party, is not clear and does not affect our analysis.

The same law firm that represented Dr. Paulo earlier in this case is now representing the three added defendants. Dr. Caputo had separate counsel.

The appendices contain only the expert's amended report, but it refers back to his original report.

Plaintiff's compliance with this second prong of due diligence is obvious.

See also Stedman's Medical Dictionary for the Health Professions and Nursing 148 (6th illus. ed. 2008) (defining an "attending physician" as "the physician formally and legally responsible for primary care and treatment throughout [a patient's] stay in a health care facility"); National Cancer Institute Dictionary of Cancer Terms, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/attending-physician (last visited Feb. 20, 2018)(similarly defining an attending physician as a "medical doctor who is responsible for the overall care of a patient in a hospital or clinic setting," and who "may also supervise and teach medical students, interns, and residents involved in the patient's care") (emphasis added). Case law provides similar connotations. See, e.g., Young v. Stevens, 132 N.J.L. 124, 129, 39 A.2d 115 (E. & A. 1944) (generally describing the duties of an attending physician); Mullins v. Conn. Gen. Life Ins. Co., 880 F.Supp.2d 713, 722 (E.D. Va. 2010) (explaining the "plain meaning" of the term).

We cannot tell from the record supplied to us which doctor(s) actually served as decedent's attending physician(s) during his hospital stay, as it was not revealed by Dr. Paulo's affidavit or defense counsel's letter of clarification.

We acknowledge case law observing that a defendant's claim of prejudice in this context should go beyond simply asserting that he or she was sued after the statute of limitations ran, such as showing the loss of evidence, the impairment of his or her ability to defend, or an unfair litigation advantage to a plaintiff. See, e.g., Farrell, 62 N.J. at 122, 299 A.2d 394 ; Claypotch, 360 N.J. Super. at 482, 823 A.2d 844. However, as illustrated by the Court's omission of a discussion of prejudice in its more recent opinion in Matynska, sometimes a plaintiff's lack of due diligence in omitting a defendant is sufficiently clear so as to render an analysis of actual prejudice unnecessary.

Indeed, as we have already noted, the motion judge initially wavered about finding the claims against Dr. Balmir to be untimely, but chose to adopt the defense's position on that point.

We do not fault the motion judge for this, as he evidently did not start participating in the case until the discovery period was well underway and Dr. Caputo had been dismissed by another judge from the case. Nor are we prescribing that case management conferences be held in every medical malpractice case, a policy issue that implicates the optimal allocation of scarce judicial resources within each vicinage. The Supreme Court only has mandated that a so-called "Ferreira" conference regarding compliance with the affidavit of merit be conducted. A.T. v. Cohen, 231 N.J. 337, 175 A.3d 932 (2017) (citing Ferreira v. Rancocas Orthopedic Assocs., 178 N.J. 144, 154-55, 836 A.2d 779 (2003) ). That said, we imagine that known statute of limitations issues in a case often can be raised and readily discussed at such a conference with the court, and a motion schedule established to deal with such issues (and prioritize discovery focused on those issues) at an early stage.

Since Dr. Balmir remains in the case, we suspect the depositions of Dr. Silkov and Choi could still be useful to the parties as factual evidence. However, we recognize the time spent on the expert analysis of those two conditionally dismissed physicians' conduct may not be particularly useful at this point, except perhaps as to causation issues.

We have not been asked by plaintiff to consider whether any conditions or sanctions, such as fee shifting or cost reimbursement, should apply here in light of defendants' delay in not moving for dismissal sooner and their efforts to extend discovery. The trial court was not asked to impose such measures and we will not consider here their hypothetical availability.