**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4525-16T4

RISA ROSENBERG, individually
and as Executrix of the Estate of
GERALD LAZAR,

     Plaintiff-Appellant,

v.

ENGLEWOOD HOSPITAL
AND MEDICAL CENTER, INC.,
MITCHELL SPINNELL, M.D.,
RUSSELL GURA, M.D., and
AMN HEALTHCARE, INC.,
d/b/a "AMERICAN MOBILE",

     Defendants,

and

JACQUILIN A. WATTS, R.N.,

     Defendant-Respondent.

_____

Argued February 25, 2019 – Decided March 21, 2019

Before Judges Sabatino, Haas and Sumners.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-1818-14.

George T. Dougherty argued the cause for appellant (Katz & Dougherty, LLC, attorneys; George T. Dougherty, on the briefs).

Jeannie Park Lee argued the cause for respondent (Rebar Bernstiel, attorneys; Cathleen Kelly Rebar, of counsel and on the brief; Jeannie Park Lee, on the brief).

PER CURIAM

This professional malpractice case arises out of the death of a hospital patient who had a fatal allergic reaction after a nurse infused him with a prescribed medication. Plaintiff's decedent claims that the nurse deviated from standards of care by allegedly leaving the patient's room too soon and failing to monitor his reaction to the drug adequately, as required by the hospital's policy.

The hospital chart entries for the critical time when the medication was administered to the patient do not contain the nurse's name. Instead, the nurse is only identified in these critical entries as "Agency Nurse RN 104." Plaintiff and her attorney attempted to discover the actual identity of the nurse from the hospital's representatives before the litigation, without success. Consequently, the complaint denominated the nurse as "Agency Nurse RN 104," which is how her identity appears on the chart.

Approximately three weeks after the statute of limitations ran, the hospital's counsel finally disclosed the nurse's identity to plaintiff's attorney. Plaintiff then sought and obtained leave from the trial court to substitute the nurse's name for the original designation.

The nurse retained counsel and thereafter moved to dismiss the complaint as untimely. A different judge granted her motion, concluding that plaintiff and her counsel had failed to act with reasonable diligence to learn the nurse's actual identity before the limitations period expired.

For the reasons that follow, we reverse and order the reinstatement of the nurse as a party defendant in this case.

I.

The Fatal Infusion

Plaintiff's decedent, Gerald Lazar, was admitted to the Englewood Hospital and Medical Center ("the Hospital") in late March 2012 for the surgical removal of a tumor in his colon. The tumor was removed without complications on March 31. The patient remained at the hospital to receive treatment for iron deficiency anemia.

On April 4, 2012, Dr. Russell Gura ordered an infusion of Iron Dextran (known as "INFeD") to treat the patient's anemia. At approximately 1:35 p.m.[1] that afternoon, a nurse, identified in the chart as Agency Nurse RN 104,[2] administered an intravenous 25 mg "test dose" of INFeD to the patient. The infusion was to be completed over a five-minute period.

The exact sequence of events that followed is the subject of dispute. Because claims as to the nurse have not been litigated or tried, we discuss the parties' allegations without adopting a definitive version of the facts. It is undisputed, however, that the patient began having an anaphylactic-type allergic reaction to the April 4 test dose of INFeD. It is also undisputed that the nurse was not in the patient's room when he began having that adverse reaction.[3] The nurse was alerted to the patient's distress by the wife of a man who was sharing

[1] The nurse's initial and amended discovery responses differ as to whether the infusion began or concluded at 1:35 p.m. We need not resolve that discrepancy here.

[2] Other chart entries use the slightly different designation "Agency RN104," "RN 104," and "104R."

[3] In her initial answers to interrogatories the nurse certified that she had been at the nurses' station when she noticed the light above the patient's room was illuminated, and immediately returned to the room to find the patient in distress. However, after the visitor provided contrary testimony, the nurse changed her interrogatory response to state she had actually been with another patient down the hall when the visitor alerted her to the patient's distress.

A-4525-16T4

the room with the patient. The visitor, who coincidentally is a pharmacist, saw the patient in distress and hurriedly left the room to find help.

After being alerted to the patient's distress by the visitor, the nurse went back to the patient's room, observed he was having trouble breathing, and called a rapid response team at approximately 2:07 p.m. The rapid response team arrived within three minutes and attempted full resuscitation. The patient did not respond to these attempts to revive him. He was intubated and moved to the Intensive Care Unit ("ICU"). Two days later, on April 6, 2012, the patient was removed from life support and he died shortly thereafter.

Plaintiff's Inquiries Before Filing Suit

In July 2012, plaintiff Risa Rosenberg, decedent's wife and the executrix of his estate, wrote to the Hospital and requested copies of his medical records. The records were supplied to her by September 2012. In December 2012, plaintiff consulted with attorneys regarding her husband's death. She thereafter retained her present counsel.

By February 2013, plaintiff's counsel had the medical records reviewed by medical experts. They advised him of their opinion that the decedent had lost his life due to professional negligence arising from the infusion of INFeD.

From approximately February 2013 through December 2013, plaintiff's counsel engaged in settlement discussions with the Hospital's insurer. Plaintiff also continued to explore additional potential recovery from the individual professionals involved in her husband's care.

On January 14, 2014, plaintiff personally sent separate certified letters to the Hospital and to the surgeon who had performed the operation on her husband, requesting information about her husband's care and the INFeD infusion. She noted that, although the Hospital had turned over 1,900 pages of records, there were "significant gaps in the record[s] which frustrate[d] [her] efforts to get a clear understanding as to why [her] husband died." In her letter to the surgeon, plaintiff posed twenty detailed questions about the conduct of her husband's caregivers, including that of "RN 104."

In her concurrent January 14, 2014 certified letter to the Hospital, plaintiff posed twenty-four questions. Question 6 of those queries pointedly requested information about the identity, credentials, and training of Agency Nurse RN 104:

> 6. As to the person identified as "RN 104" on the Hospital's records for April 4, 2012 as having started the iron dextran infusion on my husband at 1:35 PM, the person's:
>
>    a. Full name and current address[;]

b. Professional licensure as of April 4, 2012;
c. Educational history, employment history and full curriculum vitae as pertains to health care;
d. Specialized training in administration of iron dextran infusions[;]
e. Number of infusions administered prior to April 4, 2012.

[(Emphasis added).]

Nearly a month later, on February 11, 2014, a representative of the Hospital's insurer responded with a one-page letter acknowledging plaintiff's informational requests but declining to answer them. The representative asserted the decedent's passing was unrelated to his iron infusion, a position she had allegedly already conveyed to plaintiff's counsel. The representative enclosed the autopsy report to support that position.

The representative stated the insurer had "closed [its] file," in response to plaintiff's claim, and that she consequently did not "think there is a need for further communication." The representative did extend her sympathies to plaintiff, and requested that any further inquiries be directed to her rather than to the Hospital. The surgeon, meanwhile, did not respond to plaintiff's letter.[4]

Nine days after the insurance representative's letter, plaintiff filed the present complaint in the Law Division alleging causes of action for wrongful

---

[4] Plaintiff has not named the surgeon as a defendant in the lawsuit.

death and professional negligence.  The complaint named as defendants the Hospital, Dr. Gura, two other physicians, "Agency Nurse RN 104," and fictitious defendants John Doe and ABC Corporation.  Among other things, the complaint specifically claimed that Agency Nurse RN 104 performed the INFeD infusion in a "grossly negligent manner."  The complaint explained why it did not identify the nurse by her actual name, and described her as follows:

> Pending completion of discovery, the plaintiff alleges that defendant <u>Agency Nurse RN 104 was and is a registered nurse in the State of New Jersey employed by the hospital</u> as a member of the hospital staff through an agency, <u>the names of the nurse and the agency not being made available to the plaintiff by the hospital despite diligent inquiry</u>.
>
> [(Emphasis added).]

<u>Further Efforts to Identify the Nurse Post-Complaint Before the Statute of Limitations Ran</u>

On March 12, 2014, the Hospital's litigation counsel wrote plaintiff's counsel and proposed a stipulation to extend the Hospital's time to answer. Plaintiff's counsel called the Hospital's counsel on March 18 and offered to enter into the proposed stipulation extending time if the Hospital would, in turn, voluntarily engage in discovery and, more specifically, identify Agency Nurse RN 104 promptly.

8

Plaintiff's counsel followed up that telephone call with a letter on March 24. The letter specifically reiterated plaintiff's request for the Hospital to disclose the nurse's name and address, the agency she had worked for, and her curriculum vitae.

Meanwhile, that same day, the Hospital and one of its named physicians filed an answer and asserted cross-claims against all other codefendants. The Hospital's pleading did not identify the iron infusion nurse by any designation other than "Agency Nurse RN 104."

Four days later, on March 28, plaintiff's counsel served on the Hospital's counsel interrogatory requests and demand for the production of documents. The Hospital complained that plaintiff had not utilized the standard "Form C" interrogatory form for medical malpractice cases.

On March 31 plaintiff's counsel served on the Hospital a series of Requests for Admission. Among other items, the Requests sought an admission that plaintiff had previously asked for Agency Nurse RN 104's name and address from the Hospital, and the Hospital had failed to provide that information.

The Statute of Limitations Expires and the Nurse Is Identified Shortly Thereafter

On April 6, 2014, two years from the date of her husband's death, the statute of limitations expired for plaintiff's claim. See N.J.S.A. 2A:31-3.

On April 14, 2014, plaintiff's counsel wrote the Law Division judge who was then assigned to the case, requesting that she schedule a case management conference. The letter informed the judge that the Hospital had not yet identified Agency Nurse RN 104 or had it identified the agency that employed that nurse. Plaintiff's counsel stressed to the court that Agency Nurse RN 104 and the nursing agency "are two critical parties to this case." The Hospital's counsel agreed that a case management conference was appropriate.

In a letter dated April 28, 2014, the Hospital's counsel revealed to plaintiff's counsel that "Agency Nurse RN 104" was Jacquilin A. Watts, R.N. However, the Hospital did not provide plaintiff with Watts's last known address. Plaintiff's counsel followed up with the Hospital's counsel and asked for that address.

On May 9, 2014, the Hospital's counsel informed plaintiff's counsel that the Hospital did not have the last known address of Watts. Counsel suggested serving Watts through the nursing agency, American Mobile Nursing Agency ("AMN").

Five days later, plaintiff's counsel informed all other counsel to the case that Agency Nurse RN 104 had been identified as Jacquilin Watts, and that she had been employed by AMN. The letter further states: "[b]efore I can amend

and serve both as parties in place of the fictitious designations I will have some tracking down to do and have requested the cooperation of [the Hospital] in providing me the agency contract to determine . . . whether there are any provisions which would frustrate my filing a direct action against the agency." Plaintiff's counsel also suggested that all counsel discuss at the upcoming case management conference rescheduling depositions in light of the newly discovered parties.

On May 22, 2014, the then-assigned judge conducted a case management conference "to resolve discovery issues and to reset discovery time frames and end date." The partial transcript of the case management conference supplied on appeal includes the following noteworthy observation by the judge: "I read the whole file [supplied], as far as I know it's a nurse with a number. So how can you expect an expert to opine when the identity still remains unknown?" The judge was informed during the conference that Agency Nurse RN 104 had been identified as Watts. Accordingly, the judge issued an order setting various discovery deadlines, and also granted "plaintiff's counsel leave to file and serve, within 30 days hereof, an amended complaint to name Jacquilin A. Watts, R.N. as a defendant in lieu of 'RN 104.'" The motion for leave to amend was

11

unopposed by the existing defendants. Watts, who was not yet a party, was not served with the motion.

### The Complaint Is Amended to Include Watts and Her Agency

On June 26, 2014, plaintiff filed an amended complaint naming Watts and AMN as defendants. The amended complaint was filed eighty-two days after the statute of limitations had expired on April 6. Watts was served with the complaint on July 1, 2014. Watts filed an answer, and raised non-compliance with the statute of limitations as an affirmative defense.

### Summary Judgment Granted to Watts

Watts and AMN moved for summary judgment, seeking to dismiss plaintiff's amended complaint as time-barred. A new judge assigned to the case ("the motion judge") heard oral argument on June 24, 2016. The motion judge issued a written decision that same day, granting summary judgment in favor of AMN and Watts.[5]

With respect to Watts, the motion judge reasoned that plaintiff (and, by implication, her counsel) had not exercised due diligence in determining the identity of Watts before using the fictitious designation Agency Nurse RN 104, and therefore the benefits of the fictitious pleading rule were not applicable.

---

[5] Plaintiff does not appeal the grant of summary judgment in favor of AMN.

The motion judge perceived that plaintiff's counsel could and should have done more to determine the identity of Watts before filing the complaint and before the statute of limitations ran. For example, the judge suggested that plaintiff's counsel could have discovered Watts's identity by filing suit earlier and conducting discovery; making a telephone call to the Hospital's counsel before the statute ran; or reading the decedent's hospital records, which contained Watts's name in entries at time intervals other than the April 4, 2012 afternoon iron infusion.

The motion judge subsequently denied plaintiff's motion for reconsideration of Watts's dismissal. A panel of this court denied plaintiff leave to appeal that ruling.

Plaintiff eventually settled with the Hospital and voluntarily dismissed the remaining named physicians other than Dr. Gura. The case proceeded to trial against the remaining defendant, Dr. Gura.

In May 2017, the jury entered a verdict finding no liability on the part of Dr. Gura. The jury rejected plaintiff's theory of liability claiming the doctor had committed malpractice by failing to obtain the patient's informed consent to the iron infusion.

13

The present appeal concerning the dismissal of Watts ensued. Plaintiff has not appealed the jury verdict as to Dr. Gura.

II.

A.

The standards governing this appeal are well established in statutes, the Rules of Court, and case law.

The applicable statute of limitations for a survivorship action is two years following the death of the decedent. N.J.S.A. 2A:15-3. A two-year statute of limitations, measuring from the date of death, also applies to claims brought under New Jersey's Wrongful Death Act, N.J.S.A. 2A:31-1 to -6. See also LaFage v. Jani, 166 N.J. 412, 416 (2001).

The fictitious pleading rule, Rule 4:26-4, can allow a measure of relief from the strict application of a statute of limitations. The Rule provides, in pertinent part, that:

> In any action, irrespective of the amount in controversy, other than an action governed by R. 4:4-5 (affecting specific property or a res), if the defendant's true name is unknown to the plaintiff, process may issue against the defendant under a fictitious name, stating it to be fictitious and adding an appropriate description sufficient for identification. Plaintiff shall on motion, prior to judgment, amend the complaint to state defendant's true name, such motion to be accompanied

> by an affidavit stating the manner in which that information was obtained.

> [Rule 4:26-4 (emphasis added).]

The Supreme Court has construed Rule 4:26-4 to allow "a plaintiff who institutes a timely action against a fictitious defendant to amend the complaint after the expiration of the statute of limitations to identify the true defendant." Viviano v. CBS, Inc., 101 N.J. 538, 548 (1986). "When this procedure is properly utilized, [the] 'an amended complaint identifying the defendant by its true name relates back to the time of filing of the original complaint.'" Baez v. Paulo, 453 N.J. Super. 422, 437 (App. Div.), appeal denied, 235 N.J.107 (2018) (citing Viviano, 101 N.J. at 548).

A key consideration as to whether a plaintiff is entitled to the time-tolling benefits of Rule 4:26-4 is whether the plaintiff or the plaintiff's counsel have acted with due diligence in: (1) attempting to ascertain the true identity of a fictitious defendant before the statute of limitations has run, and, thereafter, in (2) moving to seek to amend the complaint once that identity has been ascertained. Id. at 439. See also Matynska v. Fried, 175 N.J. 51, 52-54 (2002); Worthy v. Kennedy Health Sys., 446 N.J. Super. 71, 89-90 (App. Div. 2016).

These published opinions illuminate the due diligence obligation. In Matynska, the Supreme Court concluded a plaintiff had failed to act with due

15

diligence in failing to name in her complaint a physician who had covered for one of his surgeon partners. The Court noted the physician's name had appeared twice in the hospital records as a doctor who had participated in the patient's care, and that the plaintiff and her attorney had not pursued steps that might have revealed his role in the treatment. For example, the plaintiff in Matynska had not contacted the hospital or the covering surgeon's partner in an effort to ascertain his identity before the limitations statute ran. Id. at 53. Under those circumstances, the Court concluded the plaintiff had not discharged her obligation to investigate all potentially responsible parties in a timely manner. Ibid.

By contrast, in Worthy, 446 N.J. Super. at 91, we reached an opposite conclusion where the patient's hospital records did not clearly disclose the responsible medical caregiver's names because their signatures were difficult to decipher. After filing the complaint using fictitious names, the plaintiff pressed the hospital to identify the unknown defendants, but the hospital delayed for months before finally revealing their names. We concluded the plaintiff had been sufficiently diligent in her efforts to identify the unknown defendants, and that the expiration of the statute of limitations could be excused under the circumstances. Id. at 90.

Our more recent decision last term in Baez, 453 N.J. Super. at 427, has several factual parallels to the present case. In Baez, the plaintiff brought a wrongful death and malpractice action arising out of the death of her adult son several days after he had been discharged from a hospital. Id. at 431. The hospital record contained the typed name of a Dr. Silkov as the admitting physician, and a separate typed entry of a Dr. Choi as the physician who discharged the patient. Id. at 432. The name of another potentially culpable physician, a Dr. Balmir, appeared in illegible handwritten entries. Moreover, the chart was replete with entries that listed a Dr. Paulo as the attending physician during the patient's stay at the hospital. However, defense counsel revealed in a post-complaint affidavit from Dr. Paulo that he was not actually the attending physician. In fact, Dr. Paulo had been away on vacation the week of patient's hospital stay and his name had appeared in the chart only for administrative purposes. Id. at 431-32.

The plaintiff in Baez thereafter voluntarily dismissed Dr. Paulo from the lawsuit, but persisted in her claims against Drs. Silkov, Choi, and Balmir. The motion judge concluded that plaintiff had failed to act with due diligence in not naming those three physicians as defendants, although the judge held that

17

defendants were precluded by principles of equitable estoppel from trying to dismiss them so late in the litigation.

On appeal in Baez, we did not adopt the trial court's estoppel analysis. Id. at 448. We evaluated the due diligence issues on a defendant-specific basis. As to Dr. Balmir, we held that the plaintiff was not dilatory because his handwritten name was indecipherable in the chart, noting the regulatory obligation of medical facilities under N.J.A.C. 8:43G-15.2(b) to have all entries in a patient's records be written legibly. Id. at 445.

We reached a more nuanced conclusion in Baez as to Drs. Silkov and Choi. We ruled that, insofar as their names had each been legibly typed on the chart in, respectively, the admission report and the discharge report, the plaintiff had not acted with due diligence in omitting those doctors from the complaint with respect to their conduct at those two points in time. Id. at 442. However, we excused the plaintiff for not naming the doctors with respect to their conduct as possible attending physicians during the course of the patient's multi-day hospital stay because the chart had identified a different name – that of Dr. Paulo – for those other entries. Id. at 442-43. We therefore allowed the lawsuit to proceed against Drs. Silkov and Choi with this important caveat. Id. at 443.

B.

Guided by these principles and the instructive cases, we review de novo the motion judge's legal determination in this case that plaintiff and her counsel failed to act with reasonable diligence to identify the actual identity of the infusing nurse "Agency Nurse RN 104" before the statute of limitations expired. See Manalapan Realty, LP v. Manalapan Twp. Comm, 140 N.J. 366, 378 (1995) (expressing the well-settled principle that reviewing courts give no special deference to a trial court's legal determinations). The trial court adduced no testimony and made no witness credibility findings. Hence, we are equally equipped to assess the documentary record and make our own independent legal evaluation of that record.

Having carefully considered the record in light of the applicable law, we are satisfied that plaintiff and her attorney acted with reasonable diligence in attempting – with no avail – to ascertain the true identity of "Agency Nurse RN 104" before filing suit and before the two-year limitations statute ran on April 6, 2014. Our assessment is supported by several compelling reasons that distinguish this situation from Matynska and make it more akin to aspects of Worthy and Baez.

To be sure, decedent's hospital records do contain the name "Watts, Jacquilin RN" in certain chart entries. However, these entries are not for the critical April 4, 2012 afternoon INFeD infusion.

The motion judge found that because Watts's name had appeared in the medical records as a nurse performing a bed check at 8:00 a.m. on April 4, plaintiff should have realized that Watts was the nurse "involved in [decedent's] care at the time of his [allergic reaction]." We disagree with that reasoning.

The medical records include not only Watts's actual name, but also the names of three other people who performed services for the decedent that day. In fact, one of those caregivers took decedent's vital signs at 1:59 p.m., which is eight minutes before the code was called at 2:07 p.m. It is not clear why plaintiff should be reasonably expected to conclude that Watts – who performed the bed check much earlier at 8:00 a.m. – was the same person who administered the 1:35 p.m. INFeD infusion. The mere fact that Watts is a nurse who had interacted with the patient hours earlier does not signify that she was the same nurse as "Agency Nurse RN 104."

Requiring plaintiff to include Watts in the complaint would logically have required plaintiff to also include as named defendants the other three people who were also identified in the decedent's records because they were also "involved

in decedent's care."  This court in <u>Baez</u> disapproved of this type of "scattershot" approach to naming defendants in malpractice complaints.  <u>See, e.g.</u>, <u>Baez</u>, 453 N.J. Super. at 444 ("To be sure, we by no means endorse the 'scattershot' naming in a malpractice complaint of every doctor whose name may appear in a patient's hospital chart.").

The services that Watts performed at the other times were apparently routine – as evidenced by the thirteen other nurses who had performed the same services in the previous days – and were not connected to the INFeD infusion. Although the motion judge relied on the fact that the notes from 8:00 a.m. bed check record used the word "infusing," that entry was referring to the status of the <u>intravenous bag</u>, which reads "Status = Infusing, Intact."  The later critical entries related to the actual INFeD infusion do not identity Watts, but instead curiously used the designation "104R" or "Agency RN104 RN."[6]

---

[6] At oral argument on the appeal, Watts's counsel hypothesized that Nurse Watts somehow might have electronically "swiped" her employee I.D. for the April 4 afternoon INFeD infusion but logged her other entries at different times in some other way to provide her actual name. We decline to adopt this speculation that lacks support in the record.  Even if the explanation is true, it does not undermine plaintiff's reasonable diligence.  We also note that Watts's chart entries for April 4 were entered retroactively after the patient had already been taken to the ICU, apparently near the end of the nurse's shift.

A-4525-16T4

Furthermore, the Medication Administration Report ("MAR") from April 1 to April 4, lists five "scheduled medications" for decedent. The last entry of the MAR is "IRON DEXTRAN (TEST DOSE) (INFED)." The INFeD entry states "25MG =.5ML INJ IV ONCE" and contains a pharmacy comment instructing that it be injected "over 5 minutes." In a column next to the INFeD entry it reads: "13:35, 25MG, 104R." Although the entry includes a "start" time as 13:00 and "stop" time as "23:43," based on Watts' deposition testimony, it seems that INFeD was administered at approximately 13:35, or 1:35 p.m.

On the next page of the MAR, it continues the list of decedent's medications and also contains a legend of "staff initials" with corresponding "staff names." In the first column of the legend under staff initials is "104R" and under the corresponding staff name is "Agency, RN104, RN." Therefore, someone reading the INFeD entry of the MAR would logically read the "104R" in the adjacent column, and then use the legend provided on the next page and discover that, unlike the other staff names, all that is included next to "104R" is "Agency, Rn104, RN." Moreover, in a "Comprehensive Order Report," Dr. Gura is listed as the physician ordering the INFeD, and "Agency, RN104 RN" is listed as the person "entering" and "confirming" the INFeD on April 4. None

22

of these critical documents contain Nurse Watts's actual name, or otherwise reflect that "104R" or "Agency, RN104, RN" is Nurse Watts.

Based on the hospital records supplied, it would be entirely reasonable for a patient's decedent and her attorney to believe that "Agency Nurse RN 104" was someone different than the other nurses and hospital staff identified by their actual names on the chart. Although we do not necessarily ascribe any improper motives as to why Watts was not identified by her actual name at the critical time when the INFeD infusion was administered on the afternoon of April 4, the change of designation could reasonably lead a prudent plaintiff off the proverbial track.

Plaintiff and her counsel pursued reasonable steps to ascertain the true identity of Agency Nurse RN 104 before filing suit and before the statute of limitations ran. The Hospital's insurer declined to answer plaintiff's specific query about the nurse's identity, which she served by certified mail in early January 2014, approximately two months before the statute of limitations ran. Concurrently, plaintiff's efforts to gain this vital pre-suit information from the surgeon was met with silence.

Even after the lawsuit was filed in February 2014, plaintiff's counsel continued to press the Hospital in March 2014 for the nurse's name, background,

and contact information. These efforts were to no avail, until plaintiff requested a case management conference, and the Hospital finally divulged the nurse's identity three weeks after the limitations period expired, and several weeks before the case management conference. Plaintiff then obtained leave to amend the complaint to substitute Nurse Watts. None of that course of action was dilatory.

We appreciate the motion judge's observation that plaintiff and her counsel could have tried earlier in the pre-suit period to obtain the nurse's identity. However, plaintiff did procure nearly two thousand records that were uninformative on the critical identity question. In the meantime, plaintiff's counsel pursued settlement possibilities. It was not unreasonable to focus on the nurse's identity once those pre-suit settlement negotiations proved to be unfruitful. Plaintiff reasonably demanded disclosure of the nurse's identity more than two months before the statute of limitations ran, unfortunately without success.

To the extent Nurse Watts is critical of the Hospital for not being more forthcoming, that is not plaintiff's problem. In any event, we discern little or no added prejudice in the brief delay in substituting her actual name as a defendant after her identity had finally been revealed. Moreover, similar to the situation

24

with Drs. Silkov and Choi in <u>Baez</u>, 453 N.J. Super. at 442-44, plaintiff has agreed to confine her theories of liability against the nurse to the critical events associated with the April 4, 2012 afternoon iron infusion, and not to events associated with the time frames in which her true name otherwise appears in the chart.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4525-16T4